# MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.
## *v.* CURRAN ET AL.

No. 80–203.   Argued November 2, 1981—Decided May 3, 1982*

---

*Together with No. 80–757, *New York Mercantile Exchange et al.* v. *Leist et al.;* No. 80–895, *Clayton Brokerage Co. of St. Louis, Inc.* v. *Leist et al.;* and No. 80–936, *Heinold Commodities, Inc., et al.* v. *Leist et al.,* on certiorari to the United States Court of Appeals for the Second Circuit.

354

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 395.

*Richard P. Saslow* argued the cause for petitioner in No. 80–203. With him on the briefs was *Douglas G. Graham. William E. Hegarty* argued the cause for petitioners in No. 80–757. With him on the briefs were *Maurice Mound, Charles Platto, Joseph W. Muccia,* and *Ruth D. MacNaughton. Gerard K. Sandweg,,Jr.,* argued the cause for petitioners in Nos. 80–895 and 80–936. With him on the briefs for petitioner in No. 80–895 was *W. Stanley Walch. Lawrence H. Hunt, Jr., Stuart S. Ball, Michael W. Davis, Donald G. McCabe, Edward J. Boyle,* and *Barbara A. Mentz* filed briefs for petitioners in No. 80–936.

*Robert A. Hudson* argued the cause and filed a brief for respondents in No. 80–203. *Leonard Toboroff* argued the cause and filed a brief for Leist et al., respondents in Nos.

80–757, 80–895, and 80–936.  *Leonard M. Mendelson* filed a brief for National Super Spuds, Inc., et al., respondents in No. 80–936.

*Barry Sullivan* argued the cause for the Commodity Futures Trading Commission as *amicus curiae* urging affirmance in No. 80–203.  With him on the brief were *Solicitor General Lee, Deputy Solicitor General Geller, Pat G. Nicolette, Gregory C. Glynn,* and *Mark D. Young.*†

JUSTICE STEVENS delivered the opinion of the Court.

The Commodity Exchange Act (CEA), 7 U. S. C. § 1 *et seq.* (1976 ed. and Supp. IV),[1] has been aptly characterized

---

†Briefs of *amici curiae* urging reversal in Nos. 80–757, 80–895, and 80–936 were filed by *John H. Stassen, Terry L. Claassen, James L. Fox, Maurice Mound, James H. O'Hagan, Jerrold E. Salzman, Edmund R. Schroeder, Walter N. Vernon III,* and *Frederick L. White* for the Board of Trade of the City of Chicago et al.; by *Stephen F. Selig* and *Barry J. Mandel* for the Futures Industry Association, Inc.; and by *Russell E. Brooks* and *Richard C. Tufaro* for the New York Stock Exchange, Inc.

*Leonard Toboroff* filed a brief for Samuel Friedman as *amicus curiae* urging affirmance in No. 80–203.

*Solicitor General McCree, Deputy Solicitor General Geller, Barry Sullivan, Pat G. Nicolette, Gregory C. Glynn,* and *Mark D. Young* filed a brief for the Commodity Futures Trading Commission as *amicus curiae* urging affirmance in Nos. 80–757, 80–895, and 80–936.

*Michael A. Doyle* filed a brief for Sunnyside Eggs, Inc., et al., as *amici curiae* in Nos. 80–757, 80–895, and 80–936.

[1] The history of the CEA includes six major legislative enactments.  The Future Trading Act, 42 Stat. 187 (1921), was declared unconstitutional in *Hill* v. *Wallace,* 259 U. S. 44 (1922), and was superseded by the Grain Futures Act, 42 Stat. 998 (1922).  Major amendments to the operative statute followed in the Commodity Exchange Act, ch. 545, 49 Stat. 1491 (1936), the Act of Feb. 19, 1968, 82 Stat. 26, the Commodity Futures Trading Commission Act of 1974, 88 Stat. 1389, and the Futures Trading Act of 1978, 92 Stat. 865.  The 1936 amendments changed the name of the operative statute to the CEA; citations to the Grain Futures Act, the original legislation, accordingly will refer to the CEA and not to the original name of the legislation.  Citations to amending legislation will refer to the date of the amendments, in order not to confuse the operative statute and the

as "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."[2] The central question presented by these cases is whether a private party may maintain an action for damages caused by a violation of the CEA. The United States Court of Appeals for the Sixth Circuit answered that question affirmatively, holding that an investor may maintain an action against his broker for violation of an antifraud provision of the CEA.[3] The Court of Appeals for the Second Circuit gave the same answer to the question in actions brought by investors claiming damages resulting from unlawful price manipulation that allegedly could have been prevented by the New York Mercantile Exchange's enforcement of its own rules.[4]

We granted certiorari to resolve a conflict between these decisions and a subsequent decision of the Court of Appeals for the Fifth Circuit,[5] and we now affirm. Prefatorily, we describe some aspects of the futures trading business, summarize the statutory scheme, and outline the essential facts of the separate cases.[6]

---

1936 amendments, both of which are entitled the Commodity Exchange Act. For a discussion of this history of federal regulation, see *infra*, at 360–367.

[2] H. R. Rep. No. 93–975, p. 1 (1974) (hereinafter House Report).

[3] 622 F. 2d 216 (1980). Accord, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Goldman*, 593 F. 2d 129, 133, n. 7 (CA8) (dictum), cert. denied, 444 U. S. 838 (1979); *Hirk* v. *Agri-Research Council, Inc.*, 561 F. 2d 96, 103, n. 8 (CA7 1977). See also *Master Commodities, Inc.* v. *Texas Cattle Management Co.*, 586 F. 2d 1352, 1355 (CA10 1978) (assuming that a private right of action exists).

[4] *Leist* v. *Simplot*, 638 F. 2d 283 (1980).

[5] *Rivers* v. *Rosenthal & Co.*, 634 F. 2d 774 (1980), cert. pending, No. 80–1542.

[6] Our understanding of the futures trading business and of the facts is gleaned primarily from the congressional Reports relating to the 1974 amendments to the CEA, the opinions of the Courts of Appeals, and the pleadings.

I

Prior to the advent of futures trading, agricultural products generally were sold at central markets. When an entire crop was harvested and marketed within a short timespan, dramatic price fluctuations sometimes created severe hardship for farmers or for processors. Some of these risks were alleviated by the adoption of quality standards, improvements in storage and transportation facilities, and the practice of "forward contracting"—the use of executory contracts fixing the terms of sale in advance of the time of delivery.[7]

When buyers and sellers entered into contracts for the future delivery of an agricultural product, they arrived at an agreed price on the basis of their judgment about expected market conditions at the time of delivery. Because the weather and other imponderables affected supply and demand, normally the market price would fluctuate before the contract was performed. A declining market meant that the executory agreement was more valuable to the seller than the commodity covered by the contract; conversely, in a rising market the executory contract had a special value for the buyer, who not only was assured of delivery of the commodity but also could derive a profit from the price increase.

The opportunity to make a profit as a result of fluctuations in the market price of commodities covered by contracts for future delivery motivated speculators to engage in the practice of buying and selling "futures contracts." A speculator who owned no present interest in a commodity but anticipated a price decline might agree to a future sale at the current market price, intending to purchase the commodity at a reduced price on or before the delivery date. A "short" sale of that kind would result in a loss if the price went up instead of down. On the other hand, a price increase would produce a gain for a "long" speculator who had acquired a contract to

---

[7] See House Report, at 33–34.

purchase the same commodity with no intent to take delivery but merely for the purpose of reselling the futures contract at an enhanced price.

In the 19th century the practice of trading in futures contracts led to the development of recognized exchanges or boards of trade. At such exchanges standardized agreements covering specific quantities of graded agricultural commodities to be delivered during specified months in the future were bought and sold pursuant to rules developed by the traders themselves. Necessarily the commodities subject to such contracts were fungible. For an active market in the contracts to develop, it also was essential that the contracts themselves be fungible. The exchanges therefore developed standard terms describing the quantity and quality of the commodity, the time and place of delivery, and the method of payment; the only variable was price. The purchase or sale of a futures contract on an exchange is therefore motivated by a single factor—the opportunity to make a profit (or to minimize the risk of loss) from a change in the market price.

The advent of speculation in futures markets produced well-recognized benefits for producers and processors of agricultural commodities. A farmer who takes a "short" position in the futures market is protected against a price decline; a processor who takes a "long" position is protected against a price increase. Such "hedging" is facilitated by the availability of speculators willing to assume the market risk that the hedging farmer or processor wants to avoid. The speculators' participation in the market substantially enlarges the number of potential buyers and sellers of executory contracts and therefore makes it easier for farmers and processors to make firm commitments for future delivery at a fixed price. The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.[8]

---

[8] See n. 11, *infra*. The ability of producers and processors to hedge against risks of price changes is only one of the advantages of futures trad-

Persons who actually produce or use the commodities that are covered by futures contracts are not the only beneficiaries of futures trading. The speculators, of course, have opportunities to profit from this trading. Moreover, futures trading must be regulated by an organized exchange. In addition to its regulatory responsibilities, the exchange must maintain detailed records and perform a clearing function to discharge the offsetting contracts that the short or long speculators have no desire to perform.[9] The operation of the exchange creates employment opportunities for futures commission merchants, who solicit orders from individual traders, and for floor brokers, who make the actual trades on the floor of the exchange on behalf of futures commission merchants and their customers. The earnings of the persons who operate the futures market—the exchange itself, the clearinghouse, the floor brokers, and the futures commission merchants—are financed by commissions on the purchase and sale of futures contracts made over the exchange.

Thus, in a broad sense, futures trading has a direct financial impact on three classes of persons. Those who actually are interested in selling or buying the commodity are described as "hedgers";[10] their primary financial interest is in the profit to be earned from the production or processing of the commodity. Those who seek financial gain by taking positions in the futures market generally are called "speculators" or "investors"; without their participation, futures markets "simply would not exist."[11] Finally, there are the

---

ing. Other advantages are described at some length in the House Report, at 132–134.

[9] The House Report, at 149, states that only about "3% of all futures contracts traded are normally settled by an actual delivery."

[10] Of course, when a hedger takes a long or a short position that is greater than its interest in the commodity itself, it is to that extent no longer a hedger, but a speculator.

[11] "Broadly speaking, futures traders fall into two general classifications, i. e. 'trade' hedging customers, and speculators. All orders which reach

futures commission merchants, the floor brokers, and the persons who manage the market; they also are essential participants, and they have an interest in maximizing the activity on the exchange. The petitioners in these cases are members of this third class whereas their adversaries, the respondents, are speculators or investors.

## II

Because Congress has recognized the potential hazards as well as the benefits of futures trading, it has authorized the regulation of commodity futures exchanges for over 60 years. In 1921 it enacted the Future Trading Act, 42 Stat. 187, which imposed a prohibitive tax on grain[12] futures transactions that were not consummated on an exchange designated

---

the trading floor originate with one or the other group of traders. The 'trade' customer is the hedger who seeks, at low cost, to protect himself or his company against possible loss due to adverse price fluctuations in the market place. Speculators, on the other hand, embrace all representatives of the general public, including some institutions, plus floor scalpers and position traders, who seek financial gain by taking positions in volatile markets. The principal role of the speculator in the markets is to take the risks that the hedger is unwilling to accept. The opportunity for profit makes the speculator willing to take those risks. The activity of speculators is essential to the operation of a futures market in that the composite bids and offers of large numbers of individuals tend to broaden a market, thus making possible the execution with minimum price disturbance of the larger trade hedging orders. By increasing the number of bids and offers available at any given price level, the speculator usually helps to minimize price fluctuations rather than to intensify them. Without the trading activity of the speculative fraternity, the liquidity, so badly needed in futures markets, simply would not exist. Trading volume would be restricted materially since, without a host of speculative orders in the trading ring, many larger trade orders at limit prices would simply go unfilled due to the floor broker's inability to find an equally large but opposing hedge order at the same price to complete the match." *Id.*, at 138.

[12] Grain was defined to include "wheat, corn, oats, barley, rye, flax, and sorghum." § 2(a) of the CEA, 42 Stat. 998, codified as amended, 7 U. S. C. § 2 (1976 ed., Supp. IV).

as a "contract market" by the Secretary of Agriculture.[13] The 1921 statute was held unconstitutional as an improper exercise of the taxing power in *Hill* v. *Wallace,* 259 U. S. 44 (1922), but its regulatory provisions were promptly re-enacted in the Grain Futures Act, 42 Stat. 998, and upheld under the commerce power in *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1 (1923).[14] Under the original legislation, the principal function of the Secretary was to require the governors of a privately organized exchange to supervise the operation of the market. Two of the conditions for designation were that the governing board of the contract market prevent its members from disseminating misleading market information [15] and prevent the "manipulation of prices or the cornering of any grain by the dealers or operators upon such board."[16] The requirement that designated contract mar-

---

[13] "It was an effort by Congress, through taxing at a prohibitive rate sales of grain for future delivery, to regulate such sales on boards of trade by exempting them from the tax if they would comply with the congressional regulations." *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 31 (1923).

[14] "The Grain Futures Act which is now before us differs from the Future Trading Act in having the very features the absence of which we held . . . prevented our sustaining the Future Trading Act. [T]he act only purports to regulate interstate commerce and sales of grain for future delivery on boards of trade because it finds that by manipulation they have become a constantly recurring burden and obstruction to that commerce." *Id.,* at 32.

Congress replaced the prohibitive tax on futures trading not conducted on a designated contract market with a direct prohibition of such trading. See § 4 of the CEA, 42 Stat. 999–1000, codified as amended, 7 U. S. C. § 6.

[15] § 5(c) of the CEA, 42 Stat. 1000, codified as amended, 7 U. S. C. § 7(c).

[16] § 5(d) of the CEA, 42 Stat. 1000. Section 5(d), codified as amended, 7 U. S. C. § 7(d), requires as a condition of designation that the governing board of the board of trade "provid[e] for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such board."

The Secretary of Agriculture also was authorized to proceed directly against a violator of these and other provisions of the CEA by suspending a

kets police themselves and the prohibitions against disseminating misleading information and manipulating prices have been part of our law ever since.

In 1936 Congress changed the name of the statute to the Commodity Exchange Act, enlarged its coverage to include other agricultural commodities,[17] and added detailed provisions regulating trading in futures contracts. Commodity Exchange Act, ch. 545, 49 Stat. 1491. Among the significant new provisions was § 4b, prohibiting any member of a contract market from defrauding any person in connection with the making of a futures contract,[18] and § 4a, authorizing a

---

violator's trading privileges. § 6(b) of the CEA, 42 Stat. 1002, codified as amended, 7 U. S. C. § 9. Moreover, misdemeanor penalties were authorized for violations of certain provisions of the CEA. § 9 of the CEA, 42 Stat. 1003, codified as amended, 7 U. S. C. § 13 (1976 ed., Supp. IV). The penalties subsequently have been increased. Today, § 9(b) of the CEA, 7 U. S. C. § 13(b) (1976 ed., Supp. IV), provides in pertinent part:

"It shall be a felony punishable by a fine of not more than $500,000 or imprisonment for not more than five years, or both, together with the costs of prosecution, for any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity . . . . Notwithstanding the foregoing, in the case of any violation described in the foregoing sentence by a person who is an individual, the fine shall not be more than $100,000, together with the costs of prosecution."

[17] The 1936 amendments extended coverage to cotton, rice, butter, eggs, and Irish potatoes. § 3(a) of the 1936 amendments, 49 Stat. 1491 (amending § 2(a) of the CEA, codified as subsequently amended, 7 U. S. C. § 2 (1976 ed., Supp. IV)).

[18] § 5 of the 1936 amendments, 49 Stat. 1493 (adding § 4b of the CEA). Section 4b, codified as amended, 7 U. S. C. § 6b, provides in pertinent part:

"It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made,

commission composed of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General to fix limits on the amount of permissible speculative trading in a futures contract.[19]   The legislation also required registration of futures commission merchants and floor brokers.[20]

on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

"(A) to cheat or defraud or attempt to cheat or defraud such other person;

"(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

"(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

"(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person."

[19] § 5 of the 1936 amendments, 49 Stat. 1492 (adding § 4a of the CEA). Section 4a, codified as amended, 7 U. S. C. § 6a, provides in pertinent part:

"(1) Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity.   For the purpose of diminishing, eliminating, or preventing such burden, the commission shall, from time to time, after due notice and opportunity for hearing, by order, proclaim and fix such limits on the amounts of trading which may be done or positions which may be held by any person under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market as the commission finds are necessary to diminish, eliminate, or prevent such burden."

[20] § 5 of the 1936 amendments, 49 Stat. 1494–1495 (adding §§ 4d(1) and 4e of the CEA, codified as amended, 7 U. S. C. §§ 6d(1) and 6e (1976 ed. and

In 1968 the CEA again was amended to enlarge its coverage[21] and to give the Secretary additional enforcement authority. Act of Feb. 19, 1968, 82 Stat. 26. The Secretary was authorized to disapprove exchange rules that were inconsistent with the statute,[22] and the contract markets were required to enforce their rules;[23] the Secretary was authorized to suspend a contract market[24] or to issue a cease-and-desist order[25] upon a showing that the contract market's rules were not being enforced. In addition, the criminal sanctions for price manipulation were increased significantly,[26] and any

Supp. IV)). The 1936 amendments also authorized the commission to order an exchange to cease and desist from violating the CEA or any rules promulgated thereunder in lieu of revoking its designation as a contract market. § 9 of the 1936 amendments, 49 Stat. 1500 (adding § 6b of the CEA, codified as amended, 7 U. S. C. § 13a (1976 ed., Supp. IV)).

[21] Livestock and livestock products were included in the definition of commodity. § 1(a) of the 1968 amendments, 82 Stat. 26 (amending § 2(a) of the CEA, codified as subsequently amended, 7 U. S. C. § 2 (1976 ed., Supp. IV)).

[22] § 23 of the 1968 amendments, 82 Stat. 33 (adding § 8a(7) of the CEA, codified as amended, 7 U. S. C. § 12a(7)).

[23] § 12(c) of the 1968 amendments, 82 Stat. 29 (adding §§ 5a(8), (9) of the CEA, codified as amended, 7 U. S. C. §§ 7a(8), (9)). Today, § 5a(8) of the CEA, 7 U. S. C. § 7a(8), requires each contract market to

"[e]nforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or by any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, and which have been approved by the Commission pursuant to paragraph (12) of this section; and revoke and not enforce any such bylaw, rule, regulation, or resolution, made, issued, or proposed by it or by the governing board thereof or any committee, which has been disapproved by the Commission."

[24] § 15 of the 1968 amendments, 82 Stat. 30 (amending § 6(a) of the CEA, codified as subsequently amended, 7 U. S. C. § 8(a) (1976 ed., Supp. IV)).

[25] § 18 of the 1968 amendments, 82 Stat. 31–32 (amending § 6b of the CEA, codified as subsequently amended, 7 U. S. C. § 13a (1976 ed., Supp. IV)).

[26] § 25 of the 1968 amendments, 82 Stat. 33–34 (amending § 9 of the CEA, codified as subsequently amended, 7 U. S. C. § 13 (1976 ed., Supp. IV)).

person engaged in price manipulation was subjected to the Secretary's authority to issue cease-and-desist orders for violations of the CEA and implementing regulations.[27]

In 1974, after extensive hearings and deliberation, Congress enacted the Commodity Futures Trading Commission Act of 1974. 88 Stat. 1389. Like the 1936 and the 1968 legislation, the 1974 enactment was an amendment to the existing statute[28] that broadened its coverage[29] and increased the penalties for violation of its provisions.[30] The Commission was authorized to seek injunctive relief,[31] to alter or supplement a contract market's rules,[32] and to direct a contract market to take whatever action deemed necessary by the Commission in an emergency.[33] The 1974 legislation retained the basic statutory prohibitions against fraudulent practices and price manipulation,[34] as well as the authority to prescribe

---

[27] § 17 of the 1968 amendments, 82 Stat. 31 (adding § 6(c) of the CEA, codified as amended, 7 U. S. C. § 13b).

[28] Title I, 88 Stat. 1389, Title II, 88 Stat. 1395, and Title IV, 88 Stat. 1412, each amended separate sections of the CEA; Title III, 88 Stat. 1406, added an entirely new section authorizing the creation of national futures associations.

[29] Section 201(b) of the 1974 amendments, 88 Stat. 1395 (amending § 2(a) of the CEA, codified as subsequently amended, 7 U. S. C. § 2 (1976 ed., Supp. IV)), extended the coverage of the statute to "all . . . goods and articles . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in."

[30] § 212 of the 1974 amendments, 88 Stat. 1403–1404 (amending §§ 6, 6b, 6(c), and 9 of the CEA, codified as subsequently amended, 7 U. S. C. §§ 9, 13, 13a, 13b (1976 ed. and Supp. IV)).

[31] § 211 of the 1974 amendments, 88 Stat. 1402 (adding § 6c of the CEA, 7 U. S. C. § 13a–1).

[32] § 213 of the 1974 amendments, 88 Stat. 1404 (replacing § 8a(7) of the CEA, 7 U. S. C. § 12a(7)).

[33] § 215 of the 1974 amendments, 88 Stat. 1404–1405 (adding § 8(9) of the CEA, 7 U. S. C. § 12a(9)).

[34] Congress extended the registration requirement and the corresponding antifraud and criminal penalty provisions to commodity trading advisers and commodity pool operators. §§ 205 and 409 of the 1974 amend-

trading limits. The 1974 amendments, however, did make substantial changes in the statutory scheme; Congress authorized a newly created Commodities Futures Trading Commission to assume the powers previously exercised by the Secretary of Agriculture, as well as certain additional powers. The enactment also added two new remedial provisions for the protection of individual traders. The newly enacted § 5a(11) required every contract market to provide an arbitration procedure for the settlement of traders' claims of no more than $15,000.[35] And the newly enacted § 14 authorized the Commission to grant reparations to any person complaining of any violation of the CEA, or its implementing regulations, committed by any futures commission merchant or any associate thereof, floor broker, commodity trading adviser, or commodity pool operator.[36] This section authorized the Commission to investigate complaints and, "if in its opinion the facts warrant such action," to afford a hearing before an administrative law judge. Reparations orders entered by the Commission are subject to judicial review.

The latest amendments to the CEA, the Futures Trading Act of 1978, 92 Stat. 865, again increased the penalties for violations of the statute.[37] The enactment also authorized the States to bring *parens patriae* actions, seeking injunctive or

---

ments, 88 Stat. 1398–1400, 1414 (adding §§ 4n, 4o, and amending § 9(c) of the CEA, codified as subsequently amended, 7 U. S. C. §§ 6n, 6o, 13 (1976 ed. and Supp. IV)).

[35] § 209 of the 1974 amendments, 88 Stat. 1401 (adding § 5a(11) of the CEA, codified as subsequently amended, 7 U. S. C. § 7a(11) (1976 ed., Supp. IV)).

[36] § 106 of the 1974 amendments, 88 Stat. 1393–1395 (adding § 14 of the CEA, codified as subsequently amended, 7 U. S. C. § 18 (1976 ed. and Supp. IV)).

[37] § 19 of the 1978 amendments, 92 Stat. 875 (amending § 9 of the CEA, 7 U. S. C. § 13 (1976 ed., Supp. IV)).

monetary relief for certain violations of the CEA, implementing regulations, or Commission orders.[38]

Like the previous enactments, as well as the 1978 amendments, the Commodity Futures Trading Commission Act of 1974 is silent on the subject of private judicial remedies for persons injured by a violation of the CEA.

## III

In the four cases before us, the allegations in the complaints filed by respondents are assumed to be true. The first involves a complaint by customers against their broker. The other three arise out of a malfunction of the contract market for futures contracts covering the delivery of Maine potatoes in May 1976, "'when the sellers of almost 1,000 contracts failed to deliver approximately 50,000,000 pounds of potatoes, resulting in the largest default in the history of commodities futures trading in this country.'"[39]

---

[38] "Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, clearinghouse, or floor broker) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this Act or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this Act, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate." § 15 of the 1978 amendments, 92 Stat. 872 (adding § 6d(1) of the CEA, 7 U. S. C. § 13a–2(1) (1976 ed., Supp. IV)).

[39] 638 F. 2d, at 285 (quoting *National Super Spuds, Inc.* v. *New York Mercantile Exchange*, 470 F. Supp. 1256, 1258 (SDNY 1979)). "The default was virtually unprecedented and, in the words of CFTC officials and members of the industry, shocked the commodity markets and the participants more than any other single event in recent years." H. R. Rep. No. 95–1181, p. 99 (1978).

*No. 80–203*

Respondents in No. 80–203 were customers of petitioner, a futures commission merchant registered with the Commission. In 1973, they authorized petitioner to trade in commodity futures on their behalf and deposited $100,000 with petitioner to finance such trading. The trading initially was profitable, but substantial losses subsequently were suffered and the account ultimately was closed.

In 1976, the respondents commenced this action in the United States District Court for the Eastern District of Michigan. They alleged that petitioner had mismanaged the account, had made material misrepresentations in connection with the opening and the management of the account, had made a large number of trades for the sole purpose of generating commissions, and had refused to follow their instructions. Respondents claimed that petitioner had violated the CEA, the federal securities laws, and state statutory and common law.

The District Court dismissed the claims under the federal securities laws and stayed other proceedings pending arbitration. App. to Pet. for Cert. in No. 80–203, pp. A–39 to A–49. On appeal, a divided panel of the Court of Appeals for the Sixth Circuit affirmed the dismissal of the federal securities laws claims,[40] but held that the contractual provision requiring respondents to submit the dispute to arbitration was unenforceable.[41] Judge Engel, writing for the majority, then *sua sponte* noticed and decided the question whether re-

---

[40] 622 F. 2d, at 221–224. The court held that a discretionary commodity account was not a security subject to the federal securities laws, relying primarily on *Milnarik* v. *M–S Commodities, Inc.*, 457 F. 2d 274 (CA7), cert. denied, 409 U. S. 887 (1972).

[41] The Court of Appeals also decided that the plaintiffs need not invoke the jurisdiction of the Commission prior to maintaining their CEA action. 622 F. 2d, at 235–236. Petitioner does not challenge that decision.

spondents could maintain a private damages action under the CEA:[42]

> "Although the CEA does not expressly provide for a private right of action to recover damages, an implied right of action was generally thought to exist prior to the 1974 amendment of the Act. Consistent with this view, no issue concerning the continuing validity of the implied right of action was raised in the court below, nor in this appeal. Nevertheless, to provide direction to the district court upon remand and to avoid further delay in this already protracted litigation, we review this issue and specifically agree that an implied private right of action survived the 1974 amendments to the Act." 622 F. 2d 216, 230 (1980) (footnotes omitted).

Judge Phillips dissented from this conclusion. *Id.*, at 237. We granted certiorari limited to this question: "Does the Commodity Exchange Act create an implied private right of action for fraud in favor of a customer against his broker?" 451 U. S. 906 (1981).

### Nos. 80–757, 80–895, and 80–936

One of the futures contracts traded on the New York Mercantile Exchange provided for the delivery of a railroad car lot of 50,000 pounds of Maine potatoes at a designated place on the Bangor and Aroostook Railroad during the period between May 7, 1976, and May 25, 1976. Trading in this contract commenced early in 1975 and terminated on May 7, 1976. On two occasions during this trading period the Department of Agriculture issued reports containing estimates that total potato stocks, and particularly Maine potato stocks, were substantially down from the previous year. This in-

---

[42] Although the complaint alleged a violation of § 6 of the CEA, the parties agree that the section under which recovery is sought is § 4b, 7 U. S. C. § 6b (quoted in n. 18, *supra*).

formation had the understandable consequences of inducing investors to purchase May Maine potato futures contracts (on the expectation that they would profit from a shortage of potatoes in May) and farmers to demand a higher price for their potatoes on the cash market.[43]

To counteract the anticipated price increases, a group of entrepreneurs described in the complaints as the "short sellers" formed a conspiracy to depress the price of the May Maine potato futures contract. The principal participants in this "short conspiracy" were large processors of potatoes who then were negotiating with a large potato growers association on the cash market. The conspirators agreed to accumulate an abnormally large short position in the May contract, to make no offsetting purchases of long contracts at a price in excess of a fixed maximum, and to default, if necessary, on their short commitments. They also agreed to flood the Maine cash markets with unsold potatoes. This multifaceted strategy was designed to give the growers association the impression that the supply of Maine potatoes would be plentiful. On the final trading day the short sellers had accumulated a net short position of almost 1,900 contracts, notwithstanding a Commission regulation[44] limiting their lawful net position to 150 contracts. They did, in fact, default.

The trading limit also was violated by a separate group described as the "long conspirators." Aware of the short conspiracy, they determined that they not only could counteract its effects but also could enhance the price the short conspirators would have to pay to liquidate their short positions by accumulating an abnormally large long position—at the close of trading they controlled 911 long contracts—and by creat-

---

[43] As a result of the first report issued in August 1975, "the price of the Contract rose from $9.75 per cwt ($.0975 per pound) to a record price of $19.15 per cwt ($.1915 per pound) by October 3, 1975." Complaint, App. in Nos. 80-757, 80-895, 80-936, p. 48.

[44] See 17 CFR § 150.10(a)(1)(iii) (1981).

ing an artificial shortage of railroad cars during the contract delivery period. Because the long conspirators were successful in tying up railroad cars, they prevented the owners of warehoused potatoes from making deliveries to persons desiring to perform short contracts.[45]

Respondents are speculators who invested long in Maine futures contracts.[46] Allegedly, if there had been no price manipulation, they would have earned a significant profit by reason of the price increase that free market forces would have produced.

Petitioners in No. 80–757 are the New York Mercantile Exchange and its officials. Respondents' complaints alleged that the Exchange knew, or should have known, of both the short and the long conspiracies but failed to perform its statutory duties to report these violations to the Commission and to prevent manipulation of the contract market. The Exchange allegedly had the authority under its rules to declare an emergency, to require the shorts and the longs to participate in an orderly liquidation, and to authorize truck deliveries and other measures that would have prevented or mitigated the consequences of the massive defaults.

Petitioners in No. 80–895 and No. 80–936 are the firms of futures commission merchants that the short conspirators used to accumulate their net short position. The complaint alleged that petitioners knowingly participated in the conspiracy to accumulate the net short position, and in doing so violated position and trading limits imposed by the Commission and Exchange rules requiring liquidation of contracts

---

[45] "Because the long conspirators had successfully tied up all the freight cars of the Bangor & Aroostook, Incomco was unable to deliver its warehoused potatoes to persons seeking delivery to fulfill short contracts. As the warm weather set in, the 1,500,000 pounds of potatoes became rotten, and Incomco's total investment was lost." 638 F. 2d, at 291.

[46] One respondent, Incomco, had taken delivery on March 1976 Maine potato futures contracts and planned to sell these potatoes to short traders in the May contract.

that obviously could not be performed.[47]   Moreover, the complaint alleged that petitioners violated their statutory duty to report violations of the CEA to the Commission.

In late 1976, three separate actions were filed in the United States District Court for the Southern District of New York.[48]   After extensive discovery, the District Court ruled on various motions, all of which challenged the plaintiffs' right to recover damages under the CEA.[49]   The District Court considered it beyond question that the plaintiffs were within the class for whose special benefit the statute had been enacted,[50] but it concluded that Congress did not in-

---

[47] Exchange Rule 44.02, governing the final day of trading, provides in part:

"(a) On the final day of trading in the delivery month, it shall be the responsibility of each clearinghouse member who is not in a position to fulfill his contractual obligation on any maturing contract by prescribed notice and tender, to have a liquidating order entered on the Exchange floor not later than five minutes before the time established as the official close for such delivery month.   All such orders shall be market orders to be executed prior to the expiration of trading."

[48] The Commission had previously commenced its own investigation, which led to administrative proceedings against various parties involved in the default on the May Maine potatoes futures contract.   See Brief for Petitioners in No. 80–936, p. 3.   Substantial penalties were imposed.   See 638 F. 2d, at 330, n. 3 (Mansfield, J., dissenting).

[49] Although the complaints are not so specific, apparently respondents sought to recover damages from all defendants under §§ 4b and 9(b) of the CEA, 7 U. S. C. §§ 6b and 13(b) (1976 ed. and Supp. IV), from the conspirator traders and their brokers under § 4a, 7 U. S. C. § 6a, and from the exchange under §§ 5(d) and 5a(8), 7 U. S. C. §§ 7(d) and 7a(8).   Sections 5(d), 9(b), 4b, 4a, and 5a(8) are quoted in nn. 16, 18, 19, and 23, *supra.*

[50] "There can be no question that plaintiffs, investors in the commodities market and a dealer in potatoes, are within the class 'for whose especial benefit the statute was enacted.'   As Senator Dole stated, the primary purposes of the 1974 amendments to the Act were '[to protect] against manipulation of markets and to protect any individual who desires to participate in futures market trading.'   Additionally, the Act itself states that price manipulation and unreasonable fluctuations in price 'are detrimental

tend a private right of action to exist under the CEA. The court granted summary judgment on all claims seeking recovery under that statute. *National Super Spuds, Inc.* v. *New York Mercantile Exchange,* 470 F. Supp. 1257, 1259–1263 (1979).

A divided panel of the Court of Appeals for the Second Circuit reversed. The majority opinion, written by Judge Friendly, adopted essentially the same reasoning as the Sixth Circuit majority in No. 80–203, but placed greater emphasis on "the 1974 Congress' awareness of the uniform judicial recognition of private rights of action under the Commodity Exchange Act and [its] desire to preserve them," *Leist* v. *Simplot,* 638 F. 2d 283, 307 (1980), and on the similarity between the implied private remedies under the CEA and the remedies implied under other federal statutes, particularly those regulating trading in securities, *id.*, at 296–299. Judge Mansfield, in dissent, reasoned that the pre–1974 cases recognizing a private right of action under the CEA were incorrectly decided and that a fair application of the criteria identified in *Cort* v. *Ash,* 422 U. S. 66, 78 (1975),[51] required rejection of plaintiffs' damages claims. 638 F. 2d, at 323.

---

to . . . persons handling commodit[ies].' " 470 F. Supp., at 1259–1260 (footnotes omitted).

[51] "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458, 460 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412, 423 (1975); *Calhoon* v. *Harvey,* 379 U. S. 134 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be

We granted certiorari. 450 U. S. 910 (1981). For the purpose of considering the question whether respondents may assert an implied cause of action for damages, it is assumed that each of the petitioners has violated the statute and thereby caused respondents' alleged injuries.

## IV

"When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights. But the Court has long recognized that under certain limited circumstances the failure of Congress to do so is not inconsistent with an intent on its part to have such a remedy available to the persons benefited by its legislation." *Cannon* v. *University of Chicago*, 441 U. S. 677, 717 (1979).

Our approach to the task of determining whether Congress intended to authorize a private cause of action has changed significantly, much as the quality and quantity of federal legislation has undergone significant change. When federal statutes were less comprehensive, the Court applied a relatively simple test to determine the availability of an implied private remedy. If a statute was enacted for the benefit of a special class, the judiciary normally recognized a remedy for members of that class. *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33 (1916).[52] Under this approach, federal courts,

---

inappropriate to infer a cause of action based solely on federal law? See *Wheeldin* v. *Wheeler*, 373 U. S. 647, 652 (1963); cf. *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 434 (1964); *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388, 394-395 (1971); *id.*, at 400 (Harlan, J., concurring in judgment)."

[52] In that case the Court stated:

"A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default

following a common-law tradition, regarded the denial of a remedy as the exception rather than the rule.[53]

Because the *Rigsby* approach prevailed throughout most of our history,[54] there is no merit to the argument advanced by

---

is implied, according to a doctrine of the common law expressed in 1 Com. Dig., *tit.* Action upon Statute (F), in these words: 'So, in every case, where a statute enacts, or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law.' (*Per* Holt, C. J., *Anon.*, 6 Mod. 26, 27.)    This is but an application of the maxim, *Ubi jus ibi remedium.*    See 3 Black. Com. 51, 123; *Couch* v. *Steel*, 3 El. & Bl. 402, 411; 23 L. J. Q. B. 121, 125." 241 U. S., at 39–40.

[53] T. Cooley, Law of Torts 790 (2d ed. 1888) described the common-law remedy for breach of a statutory duty in this way:

"[W]hen the duty imposed by statute is manifestly intended for the protection and benefit of individuals, the common law, when an individual is injured by a breach of the duty, will supply a remedy, if the statute gives none."

A few years earlier an opinion by Judge Cooley was quoted with approval by this Court in support of its holding that a railroad's breach of a statutory duty to fence its right-of-way gave an injured party an implied damages remedy.    See *Hayes* v. *Michigan Central R. Co.*, 111 U. S. 228, 240 (1884).

[54] See, *e. g.*, *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803) (" '[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded' ") (quoting 3 W. Blackstone, Commentaries *23); *Kendall* v. *United States*, 12 Pet. 524, 624 (1838) ("It cannot be denied but that congress had the power to command that act to be done; and the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist"); *Pollard* v. *Bailey*, 20 Wall. 520, 527 (1874) ("A general liability created by statute without a remedy may be enforced by an appropriate common-law action"); *Hayes* v. *Michigan Central R. Co.*, *supra*, at 240 ("[E]ach person specially injured by the breach of the obligation is entitled to his individual compensation, and to an action for its recovery"); *De Lima* v. *Bidwell*, 182 U. S. 1, 176–177 (1901) ("If there be an admitted wrong, the courts will look far to supply an adequate remedy").

petitioners that the judicial recognition of an implied private remedy violates the separation-of-powers doctrine. As Justice Frankfurter explained:

> "Courts . . . are organs with historic antecedents which bring with them well-defined powers. They do not require explicit statutory authorization for familiar remedies to enforce statutory obligations. *Texas & N. O. R. Co. v. Brotherhood of Clerks*, 281 U. S. 548; *Virginian R. Co. v. System Federation*, 300 U. S. 515; *Deckert v. Independence Shares Corp.*, 311 U. S. 282. A duty declared by Congress does not evaporate for want of a formulated sanction. When Congress has 'left the matter at large for judicial determination,' our function is to decide what remedies are appropriate in the light of the statutory language and purpose and of the traditional modes by which courts compel performance of legal obligations. See *Board of Comm'rs v. United States*, 308 U. S. 343, 351. If civil liability is appropriate to effectuate the purposes of a statute, courts are not denied this traditional remedy because it is not specifically authorized. *Texas & Pac. R. Co. v. Rigsby*, 241 U. S. 33; *Steele v. Louisville & N. R. Co.*, 323 U. S. 192; *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U. S. 210; cf. *De Lima v. Bidwell*, 182 U. S. 1." *Montana-Dakota Co. v. Northwestern Pub. Serv. Co.*, 341 U. S. 246, 261–262 (1951) (dissenting opinion).

During the years prior to 1975, the Court occasionally refused to recognize an implied remedy, either because the statute in question was a general regulatory prohibition enacted for the benefit of the public at large, or because there was evidence that Congress intended an express remedy to provide the exclusive method of enforcement.[55]    While the

---

[55] See, *e. g., T. I. M. E. Inc. v. United States*, 359 U. S. 464 (1959); *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U. S. 453 (1974).

*Rigsby* approach prevailed, however, congressional silence or ambiguity was an insufficient reason for the denial of a remedy for a member of the class a statute was enacted to protect.[56]

In 1975 the Court unanimously decided to modify its approach to the question whether a federal statute includes a private right of action.[57] In *Cort* v. *Ash,* 422 U. S. 66 (1975), the Court confronted a claim that a private litigant could recover damages for violation of a criminal statute that had never before been thought to include a private remedy. In rejecting that claim the Court outlined criteria that primarily focused on the intent of Congress in enacting the statute under review.[58] The increased complexity of federal legislation[59] and the increased volume of federal litigation strongly supported the desirability of a more careful scrutiny of legislative intent than *Rigsby* had required. Our cases subsequent to *Cort* v. *Ash* have plainly stated that our focus must be on "the intent of Congress." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.,* 451 U. S. 630, 639 (1981).[60] "The

---

[56] See, *e. g., J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964); *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191 (1967); *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968); *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969); *Sullivan* v. *Little Hunting Park,* 396 U. S. 229 (1969); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6 (1971).

[57] See *California* v. *Sierra Club,* 451 U. S. 287, 292–293 (1981).

[58] See n. 51, *supra.*

[59] Statistics compiled in J. Bibby, T. Mann, & N. Ornstein, Vital Statistics on Congress, 1980, p. 91 (1980), indicate that, compared to 30 years ago, Congress today passes fewer, but much longer, public bills.

[60] "There is no allegation that the antitrust laws expressly establish a right of action for contribution. Nothing in these statutes refers to contribution, and if such a right exists it must be by implication. Our focus, as it is in any case involving the implication of a right of action, is on the intent of Congress. *E. g., California* v. *Sierra Club,* [451 U. S.] 287; *Universities Research Assn.* v. *Coutu,* 450 U. S. 754 (1981); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979); *Touche Ross & Co.*

key to the inquiry is the intent of the Legislature." *Middlesex County Sewerage Auth.* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13 (1981). The key to these cases is our understanding of the intent of Congress in 1974 when it comprehensively reexamined and strengthened the federal regulation of futures trading.

## V

In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping.[61] When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question

---

v. *Redington*, 442 U. S. 560 (1979). Congressional intent may be discerned by looking to the legislative history and other factors: *e. g.*, the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional role of the states in providing relief. See *California* v. *Sierra Club, supra; Cort* v. *Ash*, 422 U. S. 66 (1975)."

[61] "The legislative history thus leaves little doubt that Congress was persuaded that federal employees who were treated discriminatorily had no effective judicial remedy. And the case law suggests that that conclusion was entirely reasonable. Whether that understanding of Congress was in some ultimate sense incorrect is not what is important in determining the legislative intent in amending the 1964 Civil Rights Act to cover federal employees. For the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown* v. *GSA*, 425 U. S. 820, 828 (1976) (footnote omitted).

is whether Congress intended to preserve the pre-existing remedy.

In *Cannon* v. *University of Chicago*, we observed that "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law." 441 U. S., at 696–697. In considering whether Title IX of the Education Amendments of 1972 included an implied private cause of action for damages, we assumed that the legislators were familiar with the judicial decisions construing comparable language in Title VI of the Civil Rights Act of 1964 as implicitly authorizing a judicial remedy, notwithstanding the fact that the statute expressly included a quite different remedy. We held that even under the "strict approach" dictated by *Cort* v. *Ash*, "our evaluation of congressional action in 1972 must take into account its contemporary legal context." 441 U. S., at 698–699. See *California* v. *Sierra Club*, 451 U. S. 287, 296, n. 7 (1981).

Prior to the comprehensive amendments to the CEA enacted in 1974, the federal courts routinely and consistently had recognized an implied private cause of action on behalf of plaintiffs seeking to enforce and to collect damages for violation of provisions of the CEA or rules and regulations promulgated pursuant to the statute.[62] The routine recognition of a private remedy under the CEA prior to our decision in *Cort* v. *Ash* was comparable to the routine acceptance of an analogous remedy under the Securities Exchange Act of 1934.[63] The Court described that remedy in *Blue Chip*

---

[62] There is no dispute concerning the state of the law in 1974, even by those who have argued that a private cause of action under the CEA did not survive the 1974 amendments. See, *e. g.*, *Rivers* v. *Rosenthal & Co.*, 634 F. 2d, at 779; Davis, The Commodity Exchange Act: Statutory Silence is Not Authorization for Judicial Legislation of an Implied Private Right of Action, 46 Mo. L. Rev. 316, 321 (1981).

[63] The recognition of a private cause of action under the CEA was also fully consistent with the implication doctrine followed by this Court prior to *Cort* v. *Ash*. See *supra*, at 374–377.

*Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 730 (1975) (footnote omitted):

> "Despite the contrast between the provisions of Rule 10b–5 and the numerous carefully drawn express civil remedies provided in the Acts of both 1933 and 1934, it was held in 1946 by the United States District Court for the Eastern District of Pennsylvania that there was an implied private right of action under the Rule. *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512. This Court had no occasion to deal with the subject until 25 years later, and at that time we confirmed with virtually no discussion the overwhelming consensus of the District Courts and Courts of Appeals that such a cause of action did exist. *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6, 13 n. 9 (1971); *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 150–154 (1972). Such a conclusion was, of course, entirely consistent with the Court's recognition in *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 432 (1964), that private enforcement of Commission rules may '[provide] a necessary supplement to Commission action.'"

Although the consensus of opinion concerning the existence of a private cause of action under the CEA was neither as old nor as overwhelming as the consensus concerning Rule 10b–5, it was equally uniform and well understood. This Court, as did other federal courts and federal practitioners, simply assumed that the remedy was available. The point is well illustrated by this Court's opinion in *Chicago Mercantile Exchange* v. *Deaktor*, 414 U. S. 113 (1973), which disposed of two separate actions in which private litigants alleged that an exchange had violated § 9(b) of the CEA by engaging in price manipulation and § 5a by failing both to enforce its own rules and to prevent market manipulation.[64] The Court held that

---

[64] "In one, the *Phillips* suit, it was alleged that the Exchange had forced sales of futures contracts in March 1970 fresh eggs at artificially depressed

the judicial proceedings should not go forward without first making an effort to invoke the jurisdiction of the Commodity Exchange Commission, but it did not question the availability of a private remedy under the CEA.[65]

In view of the absence of any dispute about the proposition prior to the decision of *Cort* v. *Ash* in 1975, it is abundantly clear that an implied cause of action under the CEA was a part of the "contemporary legal context" in which Congress legislated in 1974. Cf. *Cannon* v. *University of Chicago*, 441 U. S., at 698–699. In that context, the fact that a comprehensive reexamination and significant amendment of the CEA left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that

---

market prices and had thereby monopolized and restrained commerce in violation of §§ 1 and 2 of the Sherman Act, and had violated § 9(b) of the Commodity Exchange Act (CEA) by manipulating prices of a commodity for future delivery on a contract market. The Exchange was also accused of violating § 5a of the CEA for failure to enforce one of its own rules. In the second suit, the *Deaktor* case, the Exchange was charged with violating the CEA and its own rules as a designated contract market because it had failed to exercise due care to halt the manipulative conduct of certain of its members who allegedly had cornered the July 1970 market in frozen pork bellies futures contracts." 414 U. S., at 113–114 (statutory citations omitted).

[65] The Court of Appeals had expressly confirmed the availability of a private remedy, see *Deaktor* v. *L. D. Schreiber & Co.*, 479 F. 2d 529, 534 (CA7 1973), but the exchange did not question that ruling before this Court. Rather, the exchange's complaint concerned the Court of Appeals' refusal to invoke the doctrine of primary jurisdiction:

"The Chicago Mercantile Exchange has thus been put in an intolerable position. It must diligently seek to prevent, deter, and punish violations of its rules; but enforcement of its rules now exposes it to unrestricted attacks in federal courts by disgruntled traders. This situation will disrupt, if not immobilize, the self-regulatory machinery established by the Commodity Exchange Act. The doctrine of primary jurisdiction expressed in *Ricci* was designed to alleviate this dilemma." Pet. for Cert. in *Chicago Mercantile Exchange* v. *Deaktor*, O. T. 1973, No. 73–241, pp. 11–12.

Congress affirmatively intended to preserve that remedy.[66] A review of the legislative history of the statute persuasively indicates that preservation of the remedy was indeed what Congress actually intended.

## VI

Congress was, of course, familiar not only with the implied private remedy but also with the long history of federal regulation of commodity futures trading.[67] From the enactment of the original federal legislation, Congress primarily has relied upon the exchanges to regulate the contract markets. The 1922 legislation required for designation as a contract market that an exchange "provide for" the making and filing of reports and records, the prevention of dissemination of false or misleading reports, the prevention of price manipulation and market cornering, and the enforcement of Commission orders.[68] To fulfill these conditions, the exchanges promulgated rules and regulations, but they did not always enforce them. In 1968, Congress attempted to correct this flaw in the self-regulation concept by enacting § 5a(8), 7 U. S. C. § 7a(8), which requires the exchanges to enforce their own rules.[69]

---

[66] "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change, see *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 414, n. 8 (1975); *NLRB* v. *Gullett Gin Co.*, 340 U. S. 361, 366 (1951); *National Lead Co.* v. *United States*, 252 U. S. 140, 147 (1920); 2A C. Sands, Sutherland on Statutory Construction § 49.09 and cases cited (4th ed. 1973). So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).

[67] See generally *supra*, at 360–367.

[68] See 7 U. S. C. § 7.

[69] See S. Rep. No. 947, 90th Cong., 2d Sess., 2–3 (1968).

The enactment of § 5a(8), coupled with the recognition by the federal courts of an implied private remedy for violations of the CEA, gave rise to a new problem. As representatives of the exchanges complained during the hearings preceding the 1974 amendments,[70] the exchanges were being sued for not enforcing their rules. The complaint was taken seriously because it implicated the self-regulation premise of the CEA:

"In the few years [§ 5a(8)] has been in the present Commodity Exchange Act, there is growing evidence to indicate that, as opposed to strengthening the self-regulatory concept in present law, such a provision, coupled with only limited federal authority to require the exchanges to make and issue rules appropriate to enforcement of the Act—may actually have worked to weaken it. With inadequate enforcement personnel the Committee was informed that attorneys to several boards of trade have been advising the boards to *reduce*—not expand exchange regulations designed to insure fair trading, since there is a growing body of opinion that failure to enforce the exchange rules is a violation of the Act which will support suits by private litigants." House Report, at 46 (emphasis in original).[71]

---

[70] See, *e. g.*, Hearings on H. R. 11955 before the House Committee on Agriculture, 93d Cong., 2d Sess., 62 (1974); Hearings on Review of Commodity Exchange Act and Discussion of Possible Changes before the House Committee on Agriculture, 93d Cong., 1st Sess., 121 (1973).

[71] In introducing the House bill, Representative Poage, the Chairman of the House Agriculture Committee, explained this development at some length. See 119 Cong. Rec. 41333 (1973). Representative Thone, a member of that Committee, later reiterated the problem. See 120 Cong. Rec. 10748 (1974) ("Some observers believe that the provision of the 1968 amendments requiring exchanges to enforce their own rules, thereby implicitly giving private parties the right to sue for nonenforcement, has had a perverse effect. To avoid risk of litigation, exchange authorities have been encouraged to reduce rather than strengthen rules designed to insure fair trading").

Congress could have removed this impediment to exchange rulemaking by eliminating the implied private remedy,[72] but it did not follow that course. Rather, it solved the problem by authorizing the new Commodity Futures Trading Commission to supplement exchange rules.[73] Congress thereby corrected the legal mechanism of self-regulation while preserving a significant incentive for the exchanges to obey the law. Only this course was consistent with the expressed purpose of the 1974 legislation, which was to "amend the Commodity Exchange Act to *strengthen* the regulation of futures trading."[74]

Congress in 1974 created new procedures through which traders might seek relief for violations of the CEA, but the legislative evidence indicates that these informal procedures were intended to supplement rather than supplant the implied judicial remedy. These procedures do not substitute for the private remedy either as a means of compensating injured traders or as a means of enforcing compliance with the statute. The reparations procedure established by § 14 is not available against the exchanges,[75] yet we may infer from the above analysis that Congress viewed private litigation against exchanges as a valuable component of the self-regula-

---

[72] Indeed, Congress was urged to grant the exchanges immunity from private causes of action. See Hearings on Review of Commodity Exchange Act and Discussion of Possible Changes, *supra*, at 121. The president of one exchange even proposed the addition of specific language to the statute that would have granted such immunity. See Hearings on H. R. 11955, *supra*, at 123; Hearings on S. 2485, S. 2578, S. 2837, and H. R. 13113 before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess., 317 (1974).

[73] See § 8a(7) of the CEA, 7 U. S. C. § 12a(7).

[74] 88 Stat. 1389 (emphasis added).

[75] The reparations procedure is available against only futures commission merchants and their associates, floor brokers, commodity trading advisers, and commodity pool operators. In addition to exchanges, this list excludes traders who violate the CEA.

tion concept. Nor is that procedure suited for the adjudication of all other claims. The Commission may, but need not, investigate a complaint, and may, but need not, serve the respondent with the complaint. If the Commission permits the complaint to issue, it need not provide an administrative hearing if the claim does not exceed $5,000. The arbitration procedure mandated by § 5a(11) is even narrower in scope. Only members and employees of the contract market are subject to the procedure, and the use of the procedure by a trader is voluntary and is limited to claims of less than $15,000. There are other indications in the legislative history that the two sections were not intended to be exclusive of the implied judicial remedy. It was assumed by hearings witnesses that the informal procedures were supplementary.[76] Indeed, it was urged that complainants be put to the choice between informal and judicial actions.[77] A representative of one exchange urged Congress to place a dollar limit on claims arbitrable under § 5a(11) because there was an "economic impediment to Court litigation" only with small claims,[78] and such a limit was enacted. Chairman Poage described the newly enacted informal procedures as "new customer protection features,"[79] and Senator Talmadge, the Chairman of the Senate Committee on Agriculture and Forestry, stated that the reparations procedure was "not in-

---

[76] See, e. g., Hearings on H. R. 11955, supra, at 249 ("We point out that section 209 of the bill . . . requires contract markets to establish arbitration procedures for the settlement of customers' claims and grievances against members and employees of a contract market. In addition to these arbitration procedures, complainants of course have access to the courts. If the Commission is also given jurisdiction to pass upon civil disputes, there would then be a third forum for the same issues").

[77] See id., at 321.

[78] See Hearings on S. 2485, S. 2578, S. 2837, and H. R. 13113, supra, at 415.

[79] 120 Cong. Rec. 10737 (1974).

tended to interfere with the courts in any way," although he hoped that the burden on the courts would be "somewhat lighten[ed]" by the availability of the informal actions.[80]

The late addition of a saving clause in § 2(a)(1) provides direct evidence of legislative intent to preserve the implied private remedy federal courts had recognized under the CEA. Along with an increase in powers, the Commission was given exclusive jurisdiction over commodity futures trading. The purpose of the exclusive-jurisdiction provision in the bill passed by the House[81] was to separate the functions of the Commission from those of the Securities and Exchange Commission and other regulatory agencies.[82] But the provision raised concerns that the jurisdiction of state and federal courts might be affected. Referring to the treble damages action provided in another bill that he and Senator McGovern had introduced, Senator Clark pointed out: "[T]he House bill not only does not authorize them, but section 201 of that bill may prohibit all court actions. The staff of the House Agriculture Committee has said that this was done inadvertently and they hope it can be corrected in the Senate."[83] It was. The Senate added a saving clause to the exclusive-jurisdiction provision, providing that "[n]othing in this section shall

---

[80] *Id.*, at 30459.

[81] The provision in the bill passed by the House provided as follows:

"*Provided,* that the Commission shall have exclusive jurisdiction of transactions dealing in, resulting in, or relating to contracts of sale of a commodity for future delivery . . . : *And provided further,* That nothing herein contained shall supersede or limit the jurisdiction at any time conferred on the Securities [and] Exchange Commission or other regulatory authorities under the laws of the United States . . . ." H. R. 13113, 93d Cong., 2d Sess., § 201 (1974).

[82] See House Report, at 3.

[83] Hearings on S. 2485, S. 2578, S. 2837, and H. R. 13113, *supra,* at 205. For other expressions of concern, see *id.*, at 259–260 (Chairman Rodino of the House Committee on the Judiciary); *id.*, at 664 (Chairman Talmadge).

supersede *or* limit the jurisdiction conferred on courts of the United States or any State."[84]   The Conference accepted the Senate amendment.[85]

The inference that Congress intended to preserve the pre-existing remedy is compelling.   As the Solicitor General argues on behalf of the Commission as *amicus curiae,* the private cause of action enhances the enforcement mechanism fostered by Congress over the course of 60 years.   In an enactment purporting to strengthen the regulation of commodity futures trading, Congress evidenced an affirmative intent to preserve this enforcement tool.[86]   It removed an impediment to exchange rulemaking caused in part by the implied private remedy not by disapproving that remedy but rather by giving the Commission the extraordinary power to supplement exchange rules.   And when several Members of Congress expressed a concern that the exclusive-jurisdiction provision, which was intended only to consolidate federal regulation of commodity futures trading in the Commission, might be construed to affect the implied cause of action as well as other court actions, Congress acted swiftly to dispel any such notion.   Congress could have made its intent clearer only by expressly providing for a private cause of action in the statute.   In the legal context in which Congress acted, this was unnecessary.

---

[84] See 7 U. S. C. § 2.

[85] Chairmen Talmadge and Poage reported that "the conferees wished to make clear that nothing in the act would supersede or limit the jurisdiction presently conferred on courts of the United States or any State.   This act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the CFTC."   120 Cong. Rec. 34737, 34997 (1974).

[86] In his opinion for the Second Circuit panel majority, Judge Friendly extensively analyzed the evidence of legislative intent with respect to the pre-existing private remedy.   See 638 F. 2d, at 307–321.   We need not restate that analysis in the same detail.

In view of our construction of the intent of the Legislature there is no need for us to "trudge through all four of the factors when the dispositive question of legislative intent has been resolved." See *California* v. *Sierra Club*, 451 U. S., at 302 (REHNQUIST, J., concurring in judgment). We hold that the private cause of action under the CEA that was previously available to investors survived the 1974 amendments.

## VII

In addition to their principal argument that no private remedy is available under the CEA, petitioners also contend that respondents, as speculators, may not maintain such an action and that, in any event, they may not sue an exchange or futures commission merchants for their alleged complicity in the price manipulation effected by a group of short traders. To evaluate these contentions, we must assume the best possible case for the speculator in terms of proof of the statutory violations, the causal connection between the violations and the injury, and the amount of damages. It is argued that no matter how deliberate the defendants' conduct, no matter how flagrant the statutory violation, and no matter how direct and harmful its impact on the plaintiffs, the federal remedy that is available to some private parties does not encompass these actions.

The cause of action asserted in No. 80–203 is a claim that respondents' broker violated the prohibitions against fraudulent and deceptive conduct in § 4b. In the other three cases the respondents allege violations of several other sections of the CEA that are designed to prevent price manipulation.[87]

---

[87] Section 4a instructs the Commission to fix trading and position limits to curb excessive speculation. 7 U. S. C. § 6a. Section 5(d) requires as a condition for designation as a contract market that an exchange prevent price manipulation by dealers, 7 U. S.C § 7(d), and § 5a(8) imposes a duty upon contract markets to enforce their rules, 7 U. S. C. § 7a(8). Section 9(b) fixes criminal penalties for price manipulation and other violations of the CEA. 7 U. S. C. § 13(b) (1976 ed., Supp. IV).

We are satisfied that purchasers and sellers of futures contracts have standing to assert both types of claims.

The characterization of persons who invest in futures contracts as "speculators" does not exclude them from the class of persons protected by the CEA. The statutory scheme could not effectively protect the producers and processors who engage in hedging transactions without also protecting the other participants in the market whose transactions over exchanges necessarily must conform to the same trading rules. This is evident from the text of the statute. The antifraud provision, § 4b, 7 U. S. C. § 6b, by its terms makes it unlawful for any person to deceive or defraud any other person in connection with any futures contract. This statutory language does not limit its protection to hedging transactions; rather, its protection encompasses every contract that "is or may be used for (a) hedging . . . or (b) determining the price basis of any transaction . . . in such commodity." See n. 18, *supra*. Since the limiting language defines the character of the contracts that are covered, and since futures contracts traded over a regulated exchange are fungible, it is manifest that all such contracts may be used for hedging or price basing, even if the parties to a particular futures trade may both be speculators. In other words, all purchasers or sellers of futures contracts—whether they be pure speculators or hedgers—necessarily are protected by § 4b.[88]

---

[88] The language of § 4b is similar to that of § 10(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j(b), and this Court has recognized an implied cause of action under the Securities and Exchange Commission's Rule 10b–5 on behalf of all securities traders. *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S., at 13, n. 9; *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975). We recognized in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), that the implication of a cause of action under Rule 10b–5 could be "explained historically"; "the Court explicitly acquiesced in the 25-year-old acceptance by the lower federal courts of a Rule 10b–5 cause of action." *Id.*, at 692, n. 13. In terms of the number of years and the number of decisions in which an implied cause of action was recognized, the CEA action does not compare favorably with the Rule

The legislative history quite clearly indicates that Congress intended to protect all futures traders from price manipulation and other fraudulent conduct violative of the statute. It is assumed, of course, that federal regulation of futures trading benefits the entire economy; a sound futures market tends to reduce retail prices of the underlying commodities. The immediate beneficiaries of a healthy futures market are the producers and processors of commodities who can minimize the risk of loss from volatile price changes on the cash market by hedging on the futures market.[89] As the House Report on the 1974 amendments explained at length,[90] their ability to engage in hedging depends on the availability of investors willing to assume or to share the hedger's risk in the hope of making a profit. The statutory proscriptions against price manipulation and other fraudulent practices were intended to ensure that hedgers would sell or purchase the underlying commodities at a fair price and that legitimate investors would view the assumption of the hedger's risk as a fair investment opportunity. Although the speculator has never been the favorite of Congress, Congress recognized his crucial role in an effective and orderly futures market and intended him to be protected by the statute as much as the hedger. Judge Friendly's discussion of the legislative history, see 638 F. 2d, at 304–307, amply supports his observation that "[i]t is almost self-evident that legislation regulating future trading was for the 'especial benefit' of futures traders," id., at 306–307.

Although § 4b compels our holding that an investor defrauded by his broker may maintain a private cause of action

---

10b–5 action. On the other hand, Congress comprehensively reexamined the CEA in 1974 and did not amend the sections under which the cause of action had been implied; no comparable legislative approval or acquiescence exists for the Rule 10b–5 remedy.

[89] See, e. g., § 3 of the CEA, 42 Stat. 999, codified as amended, 7 U. S. C. § 5.

[90] See, e. g., n. 11, supra.

for fraud, petitioners in the three manipulation cases correctly point out that the other sections of the CEA that they are accused of violating are framed in general terms and do not purport to confer special rights on any identifiable class of persons. Under *Cort* v. *Ash*, the statutory language would be insufficient to imply a private cause of action under these sections.[91] But we are not faced with the *Cort* v. *Ash* inquiry.[92] We have held that Congress intended to preserve the pre-existing remedy; to determine whether the pre-existing remedy encompasses respondents' actions, we must turn once again to the law as it existed in 1974.

Although the first case in which a federal court held that a futures trader could maintain a private action was a fraud claim based on § 4b,[93] subsequent decisions drew no distinction between an action against a broker and an action against

---

[91] "The Court consistently has found that Congress intended to create a cause of action 'where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case.' *Cannon* v. *University of Chicago*, 441 U. S. 677, 690, n. 13 (1979). Conversely, it has noted that there 'would be far less reason to infer a private remedy in favor of individual persons' where Congress, rather than drafting the legislation 'with an unmistakable focus on the benefited class,' instead has framed the statute simply as a general prohibition or a command to a federal agency. *Id.*, at 690–692." *Universities Research Assn., Inc.* v. *Coutu*, 450 U. S. 754, 771–772 (1981).

[92] "The statutes originally enacted in 1933 and 1934 have been amended so often with full congressional awareness of the judicial interpretation of Rule 10b–5 as implicitly creating a private remedy that we must now assume that Congress intended to create rights for the specific beneficiaries of the legislation as well as duties to be policed by the SEC. This case therefore does not present the same kind of issue discussed in *Cort* v. *Ash*, 422 U. S. 66 [1975], namely, *whether* the statute created an implied private remedy. Rather, the question presented here is *who* may invoke that remedy." *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 55, n. 4 (1977) (STEVENS, J., dissenting) (emphasis in original).

[93] The seminal decision was *Goodman* v. *H. Hentz & Co.*, 265 F. Supp. 440 (ND Ill. 1967), in which the implication of a private remedy on behalf of

an exchange.[94] When Congress acted in 1974, courts were recognizing causes of action on behalf of investors against exchanges. The *Deaktor* case, which came before this Court, is an example.[95] Moreover, these actions against exchanges

---

commodity futures traders against their broker was based on Restatement of Torts § 286 (1938).

"Violation of a legislative enactment by doing a prohibited act makes the actor liable for an invasion of the interest of another if: (1) the intent of the enactment is exclusively or in part to protect the interest of the other as an individual; and (2) the interest invaded is one which the enactment is intended to protect. Restatement, Torts, Section 286. Violation of the standard of conduct set out in Section 6b of the Commodity Exchange Act is a tort for which plaintiffs, as members of the class Congress sought to protect from the type of harm they allege here, have a federal civil remedy even in the absence of specific mention of a civil remedy in the Commodity Exchange Act. The Restatement rationale was the basis for the presently well accepted rule that a civil remedy cognizable in the federal courts will be implied for a defrauded investor under Section 78j of the Securities Act of 1934 and Securities and Exchange Commission regulation 10b–5 thereunder. Kardon v. National Gypsum Co., D. C., 69 F. Supp. 512 (1946)." 265 F. Supp., at 447.

[94] *Deaktor* v. *L. D. Schreiber & Co.*, 479 F. 2d, at 534; *Booth* v. *Peavey Co. Commodity Services*, 430 F. 2d 132, 133 (CA8 1970); *Seligson* v. *New York Produce Exchange*, 378 F. Supp. 1076, 1083–1092 (SDNY 1974), aff'd, 550 F. 2d 762 (CA2), cert. denied *sub nom. Miller* v. *New York Produce Exchange*, 434 U. S. 823 (1977); *Arnold* v. *Bache & Co.*, 377 F. Supp. 61, 65–66 (MD Pa. 1973); *Gould* v. *Barnes Brokerage Co.*, 345 F. Supp. 294 (ND Tex. 1972); *Johnson* v. *Arthur Espey, Shearson, Hammill & Co.*, 341 F. Supp. 764, 766 (SDNY 1972); *McCurnin* v. *Kohlmeyer & Co.*, 340 F. Supp. 1338, 1342–1343 (ED La. 1972); *United Egg Producers* v. *Bauer International Corp.*, 311 F. Supp. 1375, 1383–1384 (SDNY 1970); *Anderson* v. *Francis I. duPont & Co.*, 291 F. Supp. 705, 710 (Minn. 1968); *Hecht* v. *Harris, Upham & Co.*, 283 F. Supp. 417, 437 (ND Cal. 1968), modified, 430 F. 2d 1202 (CA9 1970).

[95] The facts alleged in the *Deaktor* case are quite similar to those alleged in the Second Circuit case:

"Darryl B. Deaktor, plaintiff in Nos. 71–1890 and 71–1893, brought a class action against the Chicago Mercantile Exchange and various members of the Exchange alleging that the defendant members manipulated

were well recognized. During the hearings on the 1974 amendments to the CEA, a complaint voiced by representatives of the exchanges was that the exchanges were being sued for not enforcing their rules. Congress responded to the complaint by authorizing the Commission to supplement exchange rules because, we have inferred,[96] Congress wished to preserve the private cause of action as a tool for enforcement of the self-regulation concept of the CEA.

To the extent that the *Cort* v. *Ash* inquiry[97] is relevant to the question now before us—whether respondents' claims can be pursued under the implied cause of action that Congress preserved—it is noteworthy that the third and fourth factors of that inquiry support an affirmative answer. As the Solicitor General has argued on behalf of the Commodities Futures Trading Commission, it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy."[98] Moreover, there is no basis for believing that state law will afford an adequate remedy against an exchange. On the contrary, throughout the long history of federal regulation of futures trading it has been federal law that has imposed a stringent duty upon exchanges to police the trading activities in the markets that they are authorized by statute to regu-

---

and cornered the July, 1970 frozen pork bellies futures contracts market, forcing up the price of those contracts and injuring traders, such as the plaintiff, who sold short and had not liquidated their positions prior to the defendants' manipulation and thus were required to cover their positions by the purchase of contracts at inflated prices. This conduct was alleged to be in violation of 7 U. S. C. § 1 *et seq.* of the Commodity Exchange Act. The Exchange was sued on the ground of failing to exercise reasonable care in compliance with 7 U. S. C. § 7a(8), and thus failing to be aware of and to promptly halt the unlawful activities of the defendants." 479 F. 2d, at 530. See also *Seligson* v. *New York Produce Exchange, supra,* at 1083–1092.

[96] See *supra,* at 382–384.

[97] See n. 51, *supra.*

[98] *Cort* v. *Ash,* 422 U. S., at 78.

late.[99]   Since the amendments to the original legislation regulating futures trading consistently have strengthened that regulatory scheme, the elimination of a significant enforcement tool would clash with this legislative pattern.   We therefore may not simply assume that Congress silently withdrew the pre-existing private remedy against exchanges.[100]

Having concluded that exchanges can be held accountable for breaching their statutory duties to enforce their own rules prohibiting price manipulation, it necessarily follows that those persons who are participants in a conspiracy to manipulate the market in violation of those rules are also subject to suit by futures traders who can prove injury from these violations.[101]   As we said regarding the analogous Rule 10b–5, "privity of dealing or even personal contact between potential defendant and potential plaintiff is the exception and not the rule." *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S., at 745.   Because there is no indication of legislative intent that privity should be an element of the implied remedy under the CEA,[102] we are not prepared to fashion such a limitation.   As has been the case with the Rule 10b–5

---

[99] That duty has been the centerpiece of federal regulation in this area since 1921.   See *supra*, at 361–362, 382–384.

[100] "It is just as much 'judicial legislation' for a court to withdraw a remedy which Congress expected to be continued as to improvise one that Congress never had in mind."   638 F. 2d, at 313.

[101] Indeed, in the *Deaktor* case, members of the exchange alleged to have manipulated the futures contract price and cornered the market were sued by short traders.   See n. 95, *supra*.

[102] Notably, the reparations provision enacted in 1974, 7 U. S. C. § 18, includes no express limitation on the types of aggrieved persons that can seek reparations from persons registered under certain provisions of the statute.   Section 18(a) provides that "[a]ny person complaining of any violation of any provision of this chapter or any rule, regulation, or order thereunder by any person who is registered or required to be registered under section 6d, 6e, 6j or 6m of this title may, at any time within two years after the cause of action accrues," file a complaint with the Commission.

action,[103] unless and until Congress acts, the federal courts must fill in the interstices of the implied cause of action under the CEA. The elements of liability, of causation, and of damages are likely to raise difficult issues of law and proof in litigation arising from the massive price manipulation that is alleged to have occurred in the May 1976 futures contract in Maine potatoes. We express no opinion about any such question. We hold only that a cause of action exists on behalf of respondents against petitioners.

The judgments of the Courts of Appeals are affirmed.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

The Court today holds that Congress intended the federal courts to recognize implied causes of action under five separate provisions of the Commodity Exchange Act (CEA), 7 U. S. C. § 1 *et seq.* (1976 ed. and Supp IV). The decision rests on two theories. First, the Court relies on fewer than a dozen cases in which the lower federal courts *erroneously* upheld private rights of action in the years prior to the 1974 amendments to the CEA. Reasoning that these mistaken decisions constituted "the law" in 1974, the Court holds that Congress must be assumed to have endorsed this path of error when it *failed to amend* certain sections of the CEA in that year. This theory is incompatible with our constitutional separation of powers, and in my view it is without support in logic or in law. Additionally—whether alternatively or cumulatively is unclear—the Court finds that Congress in 1974 "affirmatively" manifested its intent to "preserve" pri-

---

[103] See, *e. g., Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462 (1977); *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185 (1976); *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975); *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128 (1972).

vate rights of action by adopting particular amendments to the CEA. This finding is reached without even token deference to established tests for discerning congressional intent.

I

In determining whether an "implied" cause of action exists under a federal statute, "what must ultimately be determined is whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. (TAMA)* v. *Lewis*, 444 U. S. 11, 15–16 (1979). See *Middlesex County Sewerage Auth.* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13 (1981) *(Sea Clammers)*.[1] In these cases private rights of action are asserted under five separate provisions of the CEA—two of them passed initially in 1922, two in 1936, and one adopted for the first time in 1968.[2] The Court does

---

[1] As the Court correctly observes, *ante,* at 377, reliance on congressional intent as dispositive of implication questions was at least implicit in the four-pronged inquiry mandated by *Cort* v. *Ash*, 422 U. S. 66 (1975). The *Cort* test explicitly called for inquiries into whether plaintiffs were seen by Congress as especial beneficiaries of a statutory scheme, whether an implied cause of action would be consistent with legislative purpose, and whether the asserted cause of action traditionally was relegated to state law. See *id.*, at 78. But these factors all are important primarily as indices of congressional intent. As we recently explained in *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 639 (1981), "Congressional intent may be discerned by looking to . . . , *e. g.*, the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional role of the states in providing relief."

[2] The five sections are § 4a, 7 U. S. C. § 6a; § 4b, 7 U. S. C. § 6b; § 5a(8), 7 U. S. C. § 7a(8); § 5(d), 7 U. S. C. § 7(d); and § 9(b), 7 U. S. C. § 13(b).

Though subsequently amended, §§ 5(d) and 9(b) were both adopted as part of the Grain Futures Act of 1922. See 42 Stat. 1000, 1003. Section 5(d) authorizes the Commodity Futures Trading Commission (CFTC) to designate as a "contract market" (and thus permit trading upon) a commodities exchange only when the exchange's governing board "provides for the prevention of manipulation of prices and the cornering of any commodity

not argue that Congress in 1922, in 1936, or in 1968, intended to authorize private suits for damages in the federal courts. In 1936—the year in which the CEA was adopted as the successor statute to the Grain Futures Act[3]—Congress did not even provide for federal-court jurisdiction to enforce the CEA.[4] And the Court adduces no evidence that congressional views had changed by 1968.

---

by the dealers or operators" upon the exchange. Its terms suggest no intent to confer a right of action on any class of aggrieved persons.

Section 9(b)—as are §§ 4a and 4b—is a criminal provision. It establishes that "[i]t shall be a felony" for "any person" to manipulate commodity prices, to corner commodities, to deliver false crop or market information, or to omit or misstate facts to the CFTC. Before today the Court had established that private rights of action generally would not be inferred from criminal prohibitions. See *California* v. *Sierra Club*, 451 U. S. 287, 294 (1981); *Cannon* v. *University of Chicago*, 441 U. S. 677, 690–693, n. 13 (1979).

Sections 4a and 4b were adopted as part of the Commodity Exchange Act of 1936. See 49 Stat. 1492, 1493. Section 4a provides that it is illegal for any person to buy, sell, or hold positions in excess of limitations established by the CFTC. Section 4b declares it unlawful for designated persons who make commodity futures contracts for other persons to cheat, defraud, deceive, or make false statements to such other persons. Sections 4a and 4b are similar to § 206 of the Investment Advisers Act of 1940. See 15 U. S. C. § 80b–6. We have held explicitly that the language of § 206 does not create an implied damages action. *Transamerica Mortgage Advisors, Inc. (TAMA)* v. *Lewis*, 444 U. S. 11, 16, n. 6, 24 (1979).

Section 5a(8), 7 U. S. C. § 7a(8), is traceable to the 1968 amendments. It directs that each "contract market" shall enforce its own approved rules relating to contract and trading requirements. Section 5a(8) resembles the language of 15 U. S. C. § 78q(a) (1970 ed.), that we found to create no implied private damages action under the Securities Exchange Act of 1934. *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 562, n. 2, 579 (1979).

[3] The structural history of the CEA and its antecedents is ably summarized by the Court and requires no further recounting here. See *ante*, at 360–367.

[4] Congress had included jurisdictional provisions under several securities laws preceding enactment of the 1936 amendments to the CEA, thus evidencing that it knew quite well how to authorize private suits for civil damages when it wished to do so. *TAMA, supra*, at 20–21.

If the Court focused its implication inquiry on the intent of the several Congresses that enacted the statutory provisions involved in these cases, it thus is indisputable that the plaintiffs would have no claim. "The dispositive question" in implication cases is whether Congress intended to create the right to sue for damages in federal court. "Having answered that question in the negative, our inquiry [would be] at an end." *TAMA, supra,* at 24. See *Sea Clammers, supra,* at 13.

The Court today asserts its fidelity to these principles but shrinks from their application. It does so in the first instance by invoking a novel legal theory—one that relies on congressional inaction and on erroneous decisions by the lower federal courts. In 1967 a Federal District Court in the Northern District of Illinois upheld the existence of a private right of action under one section of the CEA. *Goodman* v. *H. Hentz & Co.,* 265 F. Supp. 440 (1967). Relying on state common-law principles set forth in § 286 of the Restatement of Torts (1938), *Goodman* ruled that the "complete absence of provision for private civil actions in the Commodity Exchange Act," 265 F. Supp., at 447, was not decisive:

> "'Implied rights of action are not contingent upon statutory language which affirmatively indicates that they are intended. *On the contrary, they are implied unless the legislation evidences a contrary intention.* Brown v. Bullock, D.C., 194 F. Supp. 207, 224, aff'd on other grounds, 2 Cir., 294 F. 2d 415; cited in Wheeldin v. Wheeler, 373 U. S. 647 at 661, 662 . . . (Brennan, J., dissenting).'
>
> "There is no indication in the Commodity Exchange Act that Congress intended *not* to allow private persons injured by violations access to the federal courts." *Ibid.* (emphasis added).

The Court does not dispute that the *Goodman* court erred. The *Goodman* court placed primary emphasis on inquiring

whether Congress had created a regulatory system for the *benefit* of the plaintiffs' class. As the court's citation of the Restatement of Torts made apparent, this inquiry has been thought appropriate for common-law courts of general jurisdiction. But our cases establish that it is *not* appropriate for federal courts possessed only of limited jurisdiction. On the contrary, we have established that an "argument in favor of implication of a private right of action based on tort principles . . . is entirely misplaced." *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568 (1979). "The dispositive question [is] whether *Congress* intended to create any such [private damages] remedy." *TAMA*, 444 U. S., at 24 (emphasis added). The *Goodman* court did not even ask this question.[5]

---

[5] The Court correctly observes that the effect of *Cort* v. *Ash* was to *"modify* [this Court's] approach to the question whether a federal statute includes a private right of action." *Ante,* at 377 (emphasis added). As exemplifying a previous approach the Court quotes *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39 (1916): "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied . . . ." The Court does not appear to argue, however, that *Rigsby* mandated the *Goodman* decision. Nor does *Rigsby* somehow validate *Goodman* as a correct statement of the law as it was in 1967. As is clear from a reading of the opinion, *Rigsby* stated not so much a rule of substantive law as a maxim of statutory construction. *Rigsby* did not question that the *creation* of rights of action was a congressional function. On the contrary, in *Rigsby* the Court devoted most of its opinion, not to the question whether a remedy could be "implied" under the statute, but to the question whether it was within the constitutional power of Congress to impose tort liability of the kind asserted. See 241 U. S., at 40–43 (asserting that plaintiff will be entitled to recover "unless it be beyond the power of *Congress* under the commerce clause of the Constitution *to create* such a liability") (emphasis added).

Moreover, although the *Rigsby* approach made the denial of a damages action "the exception rather than the rule," *ante,* at 375, the Court even during the *Rigsby* period refused to recognize implied remedies where the evidence—even with the aid of the maxim—failed to indicate that Congress had intended to create them. See, *e. g., T. I. M. E. Inc.* v. *United States*, 359 U. S. 464, 474 (1959) ("The question is, of course, one of statutory in-

About 10 cases—none decided by this Court[6]—followed *Goodman's* mistake. Seven of these found *Goodman* dispositive without further comment.[7] Three remaining cases[8] added to *Goodman's* analysis only by quoting differing por-

tent"); *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 457–458 (1974) *(Amtrak)* ("It goes without saying . . . that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent . . .").

[6] One of these cases, *Deaktor* v. *L. D. Schreiber & Co.*, 479 F. 2d 529, 534 (CA7), rev'd on other grounds *sub nom. Chicago Mercantile Exchange* v. *Deaktor*, 414 U. S. 113 (1973), did come before this Court. But the petition for certiorari included no "implication" question, and our *per curiam* opinion decided the case on primary jurisdiction grounds. Reversing the decision of the Court of Appeals, which had upheld the jurisdiction of the District Court to entertain a private suit for damages under the CEA, we held that "the *Deaktor* plaintiffs, who . . . alleged violations of the CEA and the rules of the [Chicago Mercantile] Exchange, should be routed in the first instance to the [Commodity Exchange Commission] whose administrative functions appear to encompass adjudication of the kind of substantive claims made against the Exchange in this case." *Id.*, at 115.

The Court today notes that *Deaktor* "did not question the availability of a private remedy under the CEA." *Ante*, at 381. But neither does *Deaktor* exert any precedential force on an issue that the parties did not present and the Court did not decide. In any event, our disposition of the *Deaktor* case—referring the matters complained of to the Commodity Exchange Commission—at least is consistent with a view that plaintiffs enjoy no private rights of action in the courts, but that they are entitled to seek administrative relief through the procedures made available under the CEA.

[7] See *Hecht* v. *Harris, Upham & Co.*, 283 F. Supp. 417, 437 (ND Cal. 1968), modified on other grounds, 430 F. 2d 1202 (CA9 1970); *Anderson* v. *Francis I. duPont & Co.*, 291 F. Supp. 705, 710 (Minn. 1968); *Booth* v. *Peavey Co. Commodity Services*, 430 F. 2d 132, 133 (CA8 1970) (alternative holding); *McCurnin* v. *Kohlmeyer & Co.*, 340 F. Supp. 1338, 1343 (ED La. 1972); *Johnson* v. *Arthur Espey, Shearson, Hammill & Co.*, 341 F. Supp. 764, 766 (SDNY 1972); *Gould* v. *Barnes Brokerage Co.*, 345 F. Supp. 294 (ND Tex. 1972) (by implication); *Arnold* v. *Bache & Co.*, 377 F. Supp. 61, 65–66 (MD Pa. 1973).

[8] See *United Egg Producers* v. *Bauer International Corp.*, 311 F. Supp. 1375, 1384 (SDNY 1970); *Seligson* v. *New York Produce Exchange*, 378 F. Supp. 1076, 1084 (SDNY 1974), aff'd, 550 F. 2d 762 (CA2) (no explicit discussion of propriety of implying cause of action under the CEA), cert.

tions of one sentence discussing the CEA's purpose.[9]  This single sentence "leaves no doubt that Congress intended to [benefit the named classes of persons by enacting the CEA] . . . .  But whether Congress intended additionally that [the CEA] provisions would be enforced through private litigation is a different question."  *TAMA, supra,* at 17–18.  Because these cases ignore this "different question," they fail to rectify *Goodman*'s fundamental legal error—that of basing a finding of an implied cause of action under a federal statute on common-law principles.  "There is, of course, 'no federal general common law.'"  *Texas Industries, Inc.* v. *Radcliff Materials, Inc.,* 451 U. S. 630, 640 (1981), quoting *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 78 (1938).

To the Court, however, this all is irrelevant.  The *Goodman* line may have been wrong.  The decisions all may have been rendered by lower federal courts.  *Goodman* nevertheless was "the law" in 1974.  Moreover, the Court reasons, Congress must be presumed to have known of *Goodman* and its progeny, see *ante,* at 378–382; and it could have changed the law if it did not like it, see *ante,* at 381–382.  Yet Congress, the Court continues, "left intact the statutory provisions under which the federal courts had implied a cause of action."  *Ante,* at 381.  This legislative *inaction,* the Court concludes, signals a conscious intent to "preserve" the right of action that *Goodman* mistakenly had created.  *Ante,* at 382.  And this unexpressed "affirmative intent" of Congress now is binding on this Court, as well as all other federal courts.[10]

denied *sub nom. Miller* v. *New York Produce Exchange,* 434 U. S. 823 (1977); *Deaktor* v. *L. D. Schreiber & Co., supra,* at 534.

[9] "The fundamental purpose of the Commodity Exchange Act 'is to ensure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves.'"  Campbell, Trading in Futures under the Commodity Exchange Act, 26 Geo. Wash. L. Rev. 215, 223 (1958), quoting H. R. Rep. No. 421, 74th Cong., 1st Sess., 1 (1935).

[10] If Congress must be presumed to have known of the lower court deci-

This line of reasoning is inconsistent with fundamental premises of our structure of government. Fewer than a dozen District Courts wrongly create a remedy in damages under the CEA; Congress fails to correct the error; and congressional silence binds this Court to follow the erroneous decisions of the District Courts and Courts of Appeals. The Court today does not say that *Goodman* was correctly decided. Congress itself surely would reject emphatically the *Goodman* view that federal courts are free to hold, as a general rule of statutory interpretation, that private rights of action are to be implied unless Congress "evidences a contrary intention." Yet today's decision is predicated in major part on this view.

It is not surprising that the Court—having propounded this novel theory that congressional intent can be inferred from its silence, and that legislative inaction should achieve the force of law—would wish to advance an additional basis for its decision.

## II

In 1974 Congress rewrote much of the CEA. It did not, however, re-enact or even amend most of the provisions under which the Court today finds implied rights of action. But the Court does not pause over the question how Con-

---

sions in the *Goodman* line, it would seem Congress also should be presumed to have known of this Court's 1974 decision in *Amtrak, supra. Amtrak* properly directed that the implication of rights of action must adhere to congressional intent. See 414 U. S., at 457–458. More importantly, *Amtrak* also would have alerted Congress that its provision of a comprehensive scheme of administrative remedies—and the 1974 amendments to the CEA admittedly provided such a scheme, see *ante,* at 384–385—would give rise to an inference of intent to preclude alternative modes of relief. See 414 U. S., at 458 ("[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies"). The Court does not explain the relationship of *Amtrak* to Congress' presumptive knowledge of "the 'contemporary legal context' in which [it] legislated in 1974." *Ante,* at 381.

gress might legislate a right of action merely by remaining silent after the lower federal courts have misstated the law.[11] Instead it argues that at least some of the 1974 amendments evidenced an affirmative congressional intent to "preserve" implied rights of action under the CEA. *Ante,* at 381–382. Fairly read, the evidence fails to sustain this argument.

## A

In support of its argument the Court advances no evidence of the kinds generally recognized as most probative of congressional intent. It cites no statutory language stating an intent to preserve judicially created rights. It offers no legislative materials citing *Goodman* or any of its progeny in approving tones. In the hundreds of pages of Committee hearings and Reports that preceded the 1974 amendments, the Court is unable to discover even a single clear remark to the effect that the 1974 amendments would create or preserve private rights of action.

The Court relies instead on three unrelated additions to the CEA that were adopted by Congress in 1974. First, the Court places weight on the enactment of § 8a(7), 7 U. S. C. § 12a(7), which authorizes the Commodity Futures Trading Commission to supplement the trading regulations established by individual commodity exchanges. *Ante,* at 384. The accompanying House Report, H. R. Rep. No. 93–975,

---

[11] The Court opinion, see *ante,* at 381–382, and n. 66, cites cases in which we previously have held that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . ." *Lorillard* v. *Pons,* 434 U. S. 575, 580–581 (1978). Here, however, Congress did *not* re-enact the provisions in issue in 1974; the relevant 1974 amendments altered existing language, but without actively readopting the terms that were left unchanged. It also is significant that the statute involved in *Lorillard* expressly authorized private civil actions. *Id.,* at 579, n. 6. The Court cites no case in which a presumption of congressional awareness was based on erroneous lower court decisions.

p. 46 (1974), explained that the CFTC needed this power to ensure that the local exchanges would establish adequate safeguards. According to the Report, "attorneys to several boards of trade have been advising the boards to *reduce*—not expand exchange regulations . . . , since there is a growing body of opinion that failure to enforce the exchange rules is a violation of the Act which will support suits by private litigants." From this observation the Court purports to infer that Congress must have approved of the *Goodman* line of cases.

This single quotation, however, is entirely neutral as to approval or disapproval. Moreover, there is persuasive evidence on the face of the statute that Congress did not contemplate a judicial remedy for damages against the exchanges. The 1974 amendments explicitly subjected the exchanges to fines and other sanctions for nonenforcement of their own rules. See § 6b, 7 U. S. C. § 13a. But the statute specifies that fines may not exceed $100,000 per violation, *ibid.*, and that the Commission must determine whether the amount of any fine will impair an exchange's ability to perform its functions. A private damages action would not be so limited and therefore would expose the exchanges to greater liability than Congress evidently intended.

The second statutory change cited by the Court actually undercuts rather than supports its case. The Court notes that the 1974 Congress enacted two sections creating procedures for reimbursing victims of CEA violations.[12] *Ante*, at

---

[12] The added reimbursement procedures are of two types. First, the 1974 Congress added § 5a(11) to the Act. See 88 Stat. 1401. This provision requires commodity exchanges to "provide a fair and equitable procedure through arbitration or otherwise for the settlement of customers' *claims and grievances against any member or employee* [of the exchange]"(emphasis added). The procedure applies only to claims involving less than $15,000. This process evidently is designed to encourage the

384–385.   In its view these sections evidence a further intent to enhance the availability of relief in damages.   Yet the Court suggests no reason why the 1974 Congress would have enacted these duplicative channels for damages recovery if it intended at the same time to approve the implied private damages actions permitted by *Goodman*.[13]   Rather, the Court flatly contravenes settled rules for the identification of congressional intent. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."   *TAMA*, 444 U. S., at 19.[14]   "In the absence

---

speedy and voluntary resolution of smaller customer disputes at the exchange level.

Second, the 1974 amendments included a new § 14 that expressly authorized damages actions.   See 88 Stat. 1393–1394.   This adjudicatory procedure apparently is designed to resolve larger disputes or smaller § 5a(11) disputes that are not settled.   The actions are brought before the Commission rather than before an exchange.   There is no limit on the amount of damages that may be awarded.   The Commission's judgments are enforceable by actions in federal district court.   7 U. S. C. § 18.

[13] Instead of attempting to explain this overlap between the express and the implied CEA remedies, the Court points to the limitations Congress placed on its express remedies as compared to an implied *Goodman* action.   See *ante*, at 384–385, and n. 75.   The Court suggests that Congress' scheme is wanting as a tool for compensation and deterrence.   The opposite inference would be more reasonable.   One normally would assume that Congress took care to prescribe precisely those remedies compatible with its view of the costs and benefits of different modes of regulation. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode."   *Botany Worsted Mills* v. *United States*, 278 U. S. 282, 289 (1929).   See *Sea Clammers*, 453 U. S. 1, 14–15 (1981).

[14] "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement. . . . The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs."   *Northwest Airlines, Inc.* v. *Transport Workers*, 451

of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Sea Clammers*, 453 U. S., at 15.

The Court finally relies upon congressional enactment of a so-called jurisdictional saving clause as part of the 1974 amendments:

> "Nothing in this section shall supersede or limit the *jurisdiction* conferred on courts of the United States or any State." §201 (amending §2 of the Act), 88 Stat. 1395, codified at 7 U. S. C. §2 (emphasis added).

*Ante,* at 386–387.

By its terms the saving clause simply is irrelevant to the issue at hand: whether a cause of action should be implied under particular provisions of the CEA. Where judicially cognizable claims do exist, the saving clause makes clear that federal courts retain their jurisdiction. But it neither creates nor preserves any *substantive* right to sue for damages. And it is settled by our cases that "[t]he source of plaintiffs' rights must be found, if at all, in the substantive provisions of the . . . Act which they seek to enforce, not in the jurisdictional provision." *Touche Ross & Co.* v. *Redington,* 442 U. S., at 577. Cf. *Sea Clammers, supra,* at 15–17 (refusing to imply right of action even from a *substantive* "saving clause").[15]

---

U. S. 77, 97 (1981). See also *Sea Clammers, supra,* at 13–15; *Touche Ross & Co.* v. *Redington,* 442 U. S., at 574; *Amtrak,* 414 U. S., at 458.

In an effort to show that these reparation procedures were designed to *supplement* implied rights of action, the Court reviews comments made by hearing witnesses that allude to the existence of "court" actions. *Ante,* at 385–386, and nn. 76–80. These references, however, fairly must be characterized as ambiguous.

[15] In attaching substantive significance to the jurisdictional saving provision, the Court relies heavily on an isolated remark by Senator Clark. See *ante,* at 386. Senator Clark is not identified as a legislative draftsman,

## B

Despite its imaginative use of other sources, the Court neglects the only unambiguous evidence of Congress' intent respecting private actions for civil damages under the CEA. That evidence is a chart that appears in the record of Senate Committee hearings.[16] This chart compares features of four proposed bills with the "Present Commodities Exchange Act." It evidently was prepared by the expert Committee staff advising the legislators who considered the 1974 amendments.

The chart is detailed. It occupies five pages of the hearing record. Comparing the feature of "civil money penalties" between the different proposed bills, however, the chart does not list "implied damages actions" under the existing Act. Rather, it says there are "none." Neither does the chart make any reference to implied private damages actions under any of the four proposed amending bills.

Under these circumstances, the most that the Court fairly can claim to have shown is that the 1974 Congress did not dis-

---

floor manager, or committee chairman. Cf. *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 204, n. 24 (1976) ("Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill are entitled to little weight"). Moreover, the Court advances no evidence that even Senator Clark was thinking of *Goodman* actions when he expressed his concern to preserve existing state and federal jurisdiction. It is equally plausible that he was thinking primarily of federal antitrust jurisdiction and state-court jurisdiction over contract claims. These were, in fact, precisely the grounds on which three other witnesses, appearing before the same Senate Committee as Senator Clark, criticized the language of an earlier draft of the saving clause. See Hearings on S. 2485, S. 2578, S. 2837 and H. R. 13113 before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess., 259–260 (1974) (Chairman Rodino of the House Committee on the Judiciary); *id.*, at 663–664 (Deputy Assistant Attorney General Clearwaters); *id.*, at 667–668 (Director Halverson of the Bureau of Competition, Federal Trade Commission).

[16] The relevant portion of this chart is attached as an Appendix to this opinion.

approve *Goodman* and its progeny. There simply is no persuasive evidence of affirmative congressional intent to recognize rights through the enactment of statutory law, even under the Court's unprecedented theory of congressional ratification by silence of judicial error.

### III

The Court's holding today may reflect its view of desirable policy. If so, this view is doubly mistaken.

First, modern federal regulatory statutes tend to be exceedingly complex. Especially in this context, courts should recognize that intricate policy calculations are necessary to decide when new enforcement measures are desirable additions to a particular regulatory structure. Judicial creation of private rights of action is as likely to disrupt as to assist the functioning of the regulatory schemes developed by Congress. See, *e. g., Universities Research Assn., Inc.* v. *Coutu,* 450 U. S. 754, 782–784 (1981).

Today's decision also is disquieting because of its implicit view of the judicial role in the creation of federal law. The Court propounds a test that taxes the legislative branch with a duty to respond to opinions of the lower federal courts. The penalty for silence is the risk of having those erroneous judicial opinions imputed to Congress itself—on the basis of its presumptive knowledge of the "contemporary legal context." *Ante,* at 379. Despite the Court's allusion to the lawmaking powers of courts at common law, see *ante,* at 374–377, this view is inconsistent with the theory and structure of our constitutional government.

For reasons that I have expressed before, I remain convinced that "we should not condone the implication of any private right of action from a federal statute absent the most compelling evidence that Congress in fact intended such an action to exist." *Cannon* v. *University of Chicago,* 441 U. S. 677, 749 (1979) (POWELL, J., dissenting).[17] Here the

---

[17] There can be little doubt that failure to adhere to this standard will encourage the discovery of private causes of action of which Congress never

evidence falls far short of this constitutionally appropriate standard.

Accordingly, I respectfully dissent.

## APPENDIX TO OPINION OF POWELL, J., DISSENTING

| | | HUMPHREY | McGOVERN | HART | Page 5 |
|---|---|---|---|---|---|
| FEATURES | H. R. 13113 | S. 2485 | S. 2578 | S. 2837, AS AMENDED | PRESENT COMMODITY EXCHANGE ACT |
| Civil money penalties. | Permits civil money penalties up to $100,000. (Sec. 212) | Permits money penalties of $1,000 to $100,000 but only for failure to comply with a Commission order to cease and desist from violating the Act. (Sec. 7) | Permits money penalties up $100,000 and provides criteria for assessment. Civil actions may be brought by individuals for treble damages. (Sec. 16) | Civil actions may be brought by individuals for treble damages. (Sec. 505) Provides for civil money penalties for violation of a final order. (Sec. 504) Provides Commission with authority to directly impose a fine of up to $100,000, issue a cease and desist order, require restitution, suspend registration, and grant other relief that a court of equity would have the right to grant. (Sec. 406) | None. |

Commodity Futures Commission Act: Hearings on S. 2485, S. 2578, S. 2837 and H. R. 13113 before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess., 194 (1974).

---

dreamed. The escalating recourse to damages suits has placed a severe and growing burden on the lower federal courts. My research—accomplished mostly through a computer search of cases in the federal reporters—indicates that in the past decade there have been at least 243 reported Court of Appeals opinions and 515 District Court opinions dealing with the existence of implied causes of action under various federal statutes. It is time federal courts discontinued the speculative creation of damages liability where the legislative branch has chosen to remain silent.