Elmer G. YOUNGBLOOD, et al., Plaintiffs,

v.

The CITRUS ASSOCIATES OF the NEW YORK COTTON EXCHANGE, INC., et al., Defendants.

No. 74 Civ. 3543–CLB.

United States District Court, S.D. New York.

Sept. 21, 1983.

Leonard Toboroff, of Leonard Toboroff, P.C., Edward Westlow, of Lovell & Westlow, New York City, for plaintiffs.

Maurice Mound, Eugene Leiman, Michael Koblenz, Rein, Mound & Cotton, New York City, for defendants.

---

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By motion heard on June 6, 1983 and fully submitted for decision as of June 24, 1983, defendants moved, pursuant to Rule 41(b), F.R.Civ.P. for an order dismissing this class action filed in this Court on August 14, 1974, with prejudice and with costs, for neglect to prosecute.

The history of this litigation, mentioned below, illuminates an apparent loophole in our established local procedures for case management by the Court, under which, contrary to the tradition of several centuries of Anglo-Saxon jurisprudence, judicial officers undertake to require that every case be "processed" with diligence, and either dropped, settled, or tried on the merits and decided, within a reasonable period of time. The loophole exists within the administration of this Court's so-called "Suspense Docket."

Those who can remember the days in this Court before July 1, 1972 when the Individual Assignment Calendar was adopted in order to cope with a vast backlog of pending civil cases, will recall that before judicial management became the virtue sought after second only to justice itself, the protagonists in a case (usually the attorneys) determined when, if ever, the next step in a litigation would go forward. The Court hardly ever dismissed a lawsuit for neglect to prosecute, unless the movant had first taken some action to compel such prosecution. This remains the state of the law in our New York State courts. See New York CPLR § 3216, which requires a forty-five day notice to plaintiff before a defendant may move to dismiss an apparently abandoned lawsuit.

Even the most avid of case managers, paper shufflers and bureaucrats among the judges, must recognize that occasionally lawsuits exist which by their nature cannot be dismissed, and yet for perfectly legitimate reasons cannot go forward. The traditional and oft-cited example is the case of a maritime action *in rem* against a vessel of foreign registry which must be filed to toll the Statute of Limitations, but once filed cannot go forward until the vessel calls at a United States port and becomes subject to arrest to acquire *in rem* jurisdiction. Such cases linger until that happy event occurs, whereupon they are transferred to the district in which the vessel has been arrested and go forward on the merits. There are also other cases which for good reason cannot proceed; examples include pending arbitration of some but not all issues; a pending bankruptcy proceeding which has resulted in a stay; the existence of proceedings pending before an International Commission (the Iranian claims); and actions which will or may be determined by a point of law to be decided in some pending appeal in an otherwise unrelated case.

Since, as noted, there are such cases which the most avid case managing judge cannot manage, and because their presence in the statistical caseload reports (the "backlog") distorts reality and makes such statistics useless, a practice has developed of placing such cases on the "Suspense Docket." The only express authority for maintenance of the Suspense Docket is found in the "Rules for the Division of Business Among District Judges, pursuant to 28 U.S.C. § 137," adopted by this Court (hereinafter the "IAC Rules"), and specifically, Rule 20 thereof, which reads as follows:

> "Rule 20.   Transfer of Cases to The Suspense Docket
>
> A civil case which, for reasons beyond the control of the court, can neither be tried nor otherwise terminated shall be transferred to the Suspense Docket. In the event the case becomes activated thereafter it shall be restored to the docket of the transferor judge if he is available, otherwise to be reassigned by lot."

As can be perceived from a reading of IAC Rule 20, there is in effect no assigned judge, once a case has been placed on the Suspense Docket, so there is no case management. Once consigned to this statistical limbo a case lingers there until it becomes more than three years old, and more than one year has elapsed since any docket entry

has been made. At that time, pursuant to an official Memorandum from the Administrative Office of the U.S. Courts dated June 15, 1973, the case is marked "statistically closed" by a "Minute Order," signed by the Chief Judge. This statistical closing has no meaning except for its cosmetic effect upon the computer printouts by which the caseloads and backlogs of the various district courts are reckoned. The order filed in this case on June 22, 1978 by then Chief Judge Edelstein reads in relevant part as follows:

"Nothing contained in this minute order shall be considered a dismissal or disposition of [the action], and should further proceedings ... become necessary or desirable, any party may initiate it in the same manner as if this minute order had not been entered."

Having described the loophole, we now turn our attention to this litigation, and consider whether a litigant who has placed his case on the Suspense Docket, with the approval of this Court, should thereafter be dismissed for failure to prosecute, when no prior demand has been made upon him by the adverse party, and no judicial supervision has been devoted to the case.

The plaintiffs, who invest or speculate in commodity futures, sued in their own right and for the benefit of a purported class, for damages arising out of the procedures followed by defendants, including The Citrus Associates of the New York Cotton Exchange, Inc. and certain members thereof, following upon the price freeze imposed by President Nixon in 1971. No class designation has yet been made. An identical lawsuit was filed initially by some or all of these plaintiffs in a federal court in Florida, but *in personam* jurisdiction could not be obtained. The same claim was then asserted timely in this district by filing this action.

Defendants, in October, 1974, moved to stay this action on the ground that under the then existing law the matter at issue had first to be considered by the Commodity Exchange Commission, now known as the Commodity Futures Trading Commission (hereinafter "CFTC"). This motion

was resolved by a stipulation, approved by the Court on June 18, 1975. This document is entitled "Stipulation and Order Placing Action on Suspense Docket." It reads in relevant part as follows:

"The parties through their counsel stipulate as follows:

1. That all proceedings in this action be stayed until further order of the Court or until the receipt by the Court of the decision of the Commodity Futures Trading Commission in this case except as set forth in paragraph 4.

2. That nothing herein shall prevent either of the parties from applying for an order vacating the aforesaid stay.

3. That upon the entry of an order vacating the aforesaid stay the time for the defendants to move or answer be extended for 30 days after the entry of said order.

4. That the aforesaid stay shall not prevent the plaintiffs from serving process on defendants who have not been served provided a copy of this stipulation be served with said process; that the aforesaid stay shall apply to all proceedings by or against said newly served defendants; and that the time for said newly served defendants to move or answer shall be extended until 30 days after the entry of an order vacating the aforesaid stay.

5. That the time for the filing of plaintiffs' motion for class action determination under Rule 11A of the Civil Rules of this Court be extended until 180 days after the entry of an order vacating the aforesaid stay.

6. That this case be transferred to the suspense docket of the Court."

A fair reading of the Stipulation and Order against the background of our calendar practices suggests to this Court that the stay consented to could only be terminated either as a result of a written stipulation of counsel approved by the Court and filed, or a Court order. This Court rejects defendants' present construction of the Stipulation and Order, which contends that it ended automatically and that the case was re-

stored to the Court's active docket automatically when the reason for the stay ceased. Rule 20 of the IAC Rules speaks in the passive voice of a case becoming "activated thereafter," but the invariable custom and practice since the adoption of the IAC Rules in 1972, has always been that no case was so "activated" or restored to a judge's active docket from the Suspense Docket, except by a stipulation approved by the Court, or a Court order, or a direction in writing to the Coordinating Clerk made by the Assignment Committee which administers the IAC Rules pursuant to Rule 2, or by the Judge who had placed the case on the Suspense Docket in the first instance.[1] Neither the Stipulation and Order of June 18, 1975 in this case, nor the IAC Rules themselves, would have the effect of automatically reactivating the case upon the happening of a future event not a part of the court record in this district, as for example, the rendering of a decision by the CFTC.

As the reader may well have anticipated by now, in April 1976, the CFTC by letter, a copy of which was sent to the Court, advised plaintiffs' then attorney, whose office was in Florida, that the CFTC had declined jurisdiction over the matter and that "this action by the CFTC should leave the parties free to pursue their remedies in that certain litigation filed at 74 Civil Action No. 3543 in the United States District Court for the Southern District of New York known as *Youngblood, et al. v. The Citrus Associates of the New York Cotton Exchange, Inc., et al.*" A copy of this letter was also sent to the attorneys appearing for the defendants in this action. See Exhibit D attached to motion docketed April 11, 1983.

Thereafter, until February 28, 1983, except for desultory efforts to settle the matter out of court by exchanges of correspondence, no further steps were taken by any party. During that intervening period it seems that two of the plaintiffs have died, as have defendants John M. Williams and Perry E. Moore. Plaintiffs' local counsel of record withdrew from practice in the City of New York to pursue professional commitments upstate.

When the ghost of Marley began to rattle its chains for the first time on February 28, 1983, a new attorney, not previously associated with the matter was the cause of the activity. The chain rattling took the form of a letter to the Court, with copy to defense counsel, reading as follows:

> "[We] have been retained by [*sic*, probably means "as"] counsel for plaintiff to continue the prosecution of this litigation. Now that the Supreme Court has confirmed the private right of action in *Curran, et al. v. Merrill Lynch, et al.*, [*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182] (1982), the case should be placed on the active calendar.
>
> May we have a status conference before Your Honor as soon as conveniently possible?"

It will be noted that the transfer to the Suspense Docket was not expressly predicated upon the pendency of the *Curran* case in the Supreme Court. Standing alone, the argument that delay in this litigation was justified by the time consumed by the Supreme Court in deciding *Curran,* a decision rendered May 3, 1982, is a rather lame excuse. There was certainly no agreement with this Court that the case would be stayed awaiting *Curran,* and if counsel had such a private agreement *in pais,* as is now claimed, not disclosed to the Court, by which either side could defer the case indefinitely, such an agreement would be void, unless in writing. In any event, the making of any such agreement is disputed by defense counsel, and the Court is not disposed to referee a credibility contest between the attorneys in the case as to whether or not such an agreement was made, and if so, why it was not reduced to writing, as required by the customs and practices in this District and indeed in the

---

1. The Assignment Committee consists solely of the Chief Judge and two active judges, and its decision to "activate" a case on the Suspense Docket must be viewed as a judicial act.

New York State courts which sit in the metropolitan counties.[2]

On July 30, 1976, the Florida lawyer for plaintiff, wrote to defendants' attorney (not to the Court) stating that it was his intention to have the proceeding in the Southern District of New York again placed on the active calendar and proceed with discovery in the case. The same letter also suggested that an effort be made to settle the case and attempted to open negotiations for a settlement sum. Defendants' attorney answered on August 9, 1976 with a promise that he would submit the suggestion for settlement to the directors of the Exchange at its September meeting. September expired with silence on the part of the defense, so the Florida attorney, Mr. Kanar, wrote again under date of October 12, 1976, asking whether the defendants had made a determination concerning settlement. That letter suggested that in the event an early settlement appears unlikely, counsel should proceed by notifying the Court, and by production of documents to identify the members of the proposed class.

On October 19, 1976, defendants' attorneys for the first time in behalf of their clients rejected the settlement proposal which had been made on July 30, 1976, stating reasons going to the merits of the dispute. This letter appeared to leave the door open to further settlement discussions; the author invited attorney Kanar to present additional information and promised that if he did, defense counsel would examine it and make a recommendation to the Exchange.

Again, on January 8, 1980, attorney Kanar wrote to defendants' attorney seeking to renew settlement discussions. This was followed by defendants' response dated January 11, 1980 which again did not agree to a settlement, but did not close the door on negotiations. A further letter of February 7, 1980 offered to settle the case in what might be described as a nominal fashion. It was not until April 7, 1980 that defendants'

attorney responded to Mr. Kanar advising that the Board of Directors of the Exchange had decided not to take action on the offer until after the decision of the Court of Appeals in an unrelated case, *Leist,* later to become part of the *Curran* case in the Supreme Court.

Defendants now (Memo., p. 26) describe this exchange as not "negotiations" but merely offers made by plaintiffs to settle. However, those offers to settle were never firmly and finally rejected. Each letter quoted to the Court appears to leave open the door to further discussion. Knowing throughout the years, at least through 1980, that plaintiffs still considered their claim alive, and not having made any demand that the litigation be dropped or tried, defendants must accept some of the burdens of the delay under the circumstances of this case.

Defendants' April 7, 1980 letter shows a wish, although not an agreement, to hold settlement discussions in abeyance pending the outcome of litigation in the unrelated potato futures cases, *Leist v. Simplot,* 638 F.2d 283 (2d Cir.1980), aff'd sub nom *Merrill Lynch, etc. v. Curran, supra,* which would determine whether or not a private right of action existed under the Act. Although hindsight is perfect, this Court must note in fairness that when certiorari was granted in *Leist v. Simplot,* a decision reversing an opinion by then Chief Judge MacMahon of this Court which declined to let the genie out of the bottle in connection with commodities futures by implying a federal claim, most practitioners could reasonably believe that a Supreme Court regarding itself as overworked would not have taken the *Leist* case, then intending, as it ultimately did, to bless the result. While that case was pending on appeal, other litigants had attempted to stay cases parallel in theoretical concept to *Leist,* and some district judges had granted stays in such litigation.

---

**2.** We note in passing that such "standstill" agreements, when in writing, although subject to unilateral termination on notice by either party at any time, generally do preclude dismissal for neglect to prosecute. *Cf., DeSilvio v. Prudential Lines, Inc.,* 701 F.2d 13 (2d Cir. 1983).

Plaintiffs assert without contradiction that their Florida attorney came to New York "on or about June 3, 1982 to attempt to secure a new local counsel to reactivate the case, and that negotiations for a new attorney were concluded in about December 1982." June 3rd was exactly one month following the coming down of the Supreme Court decision in *Curran,* rendition of which, in fairness, must be regarded as having improved plaintiffs' litigation position in this case.[3] On February 28, 1983, as noted above, the new attorneys attempted to reactivate this case by writing a letter to the Court. The Court could not say in fairness that the lapse of time between May 3, 1982, the date of the decision in *Curran,* and the coming in of the letter on February 28, 1983 was a neglect to prosecute.

Apart from the prejudice naturally arising in any litigation because of the passage of time, defendants show no specific instance of prejudice except with respect to the two defendants who have died. Presumably their estates have been administered and closed by now, and of course they cannot now testify at the trial in their own defense. There is also the possibility not yet demonstrated to exist in fact, that the estates of the two individual plaintiffs who have died might enjoy an unfair advantage if the case is pursued by their personal representatives.

Plaintiffs' argument is expressed ultimately as follows:

"In short, defendants' counsel are trying to have it both ways. On the one hand [defendants' counsel] negotiated an agreement to hold this case in abeyance, conducted settlement negotiations apparently in good faith, and argued to other courts that similar cases ought to be held in abeyance. On the other hand [defendants' counsel] swears that plaintiffs' counsel 'did nothing' for nearly seven years. On the contrary, plaintiffs' counsel and defendants' counsel knew well that this case had not been abandoned and had agreed that it be held in abeyance." (Plaintiffs' Brief docketed May 10, 1983 at p. 6).

There was no express agreement to that effect, however assent may be implied from the totality of events. While it is true that the defendants had no duty to call the delay to the Court's attention prior to this time (and indeed if the case had not been on the Suspense Docket there would have been no need to call such delay to this Court's attention), nevertheless the defendants' conduct is a factor which may be considered. There are extenuating circumstances here, and in light of the fact that the case was placed in a dormant condition initially by Stipulation, approved by the Court, and the delay involves no neglect to comply with this Court's case management directions, we should in weighing our exercise of discretion, be motivated strongly by the basic principle that all litigation should be determined if possible on the merits, or lack thereof.

This case is also unusual in that it is a class action. Whether class action status should actually be declared in this case must await a hearing, and considerations which will affect the Court when and if such a hearing is conducted may be vastly different than the considerations which weigh our determination as to whether the case should be dismissed for neglect. However, the pendency of a class action tolls the Statute of Limitations as to the absent class members. It would indeed be unusual if this Court were to dismiss the case as to the named plaintiffs to find that the absent class members would remain secure in their right to initiate new litigation in 1983 or 1984 arising out of these 1971 events, while

---

**3.** We do not rely on any "agreement" here to suspend this case until the outcome of the *Leist* case. If there were such an agreement, it was the duty of counsel to reduce it to writing. However, it is essentially true that it was reasonable to await the outcome of the *Leist* case, because if, as smart money would have wagered, the Supreme Court in *Curran* would have reversed the result obtained in the Second Circuit in *Leist,* this case would have died with *Leist.*

the named plaintiffs were precluded. Indeed just such a plaintiff might appear.[4]

Finding no intentional misconduct or flouting of any Court imposed deadline for trial readiness and considering all relevant factors affecting the history of this case, the Court finds it inappropriate as a matter of discretion to dismiss for neglect to prosecute, at this time. Accordingly, the motion is denied. With respect to the estates of decedents, the motion may be renewed when pre-trial preparations are complete, upon a showing of unreasonable prejudice flowing from the fact of intervening death.

Counsel are directed to have an office conference to consider entering into an agreed schedule for prompt completion of any necessary pre-trial proceedings. The action is hereby assigned for all pre-trial purposes to the Hon. Joel J. Tyler, United States Magistrate.

So Ordered.

See also, D.C., 99 F.R.D. 578.

4. This Court expresses no opinion at this time as to whether this case should be maintained as a class action.